BEFORE THE
UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| GALVASID S.A. DE C.V., ) <br> ) <br> Plaintiff ) <br> ) <br> v. ) <br> ) <br> UNITED STATES, ) <br> ) <br> Defendant. ) <br> ) | Court No. 26-00825 |

COMPLAINT

Plaintiff Galvasid S.A. de C.V. files this complaint to contest the final determination by the U.S. Department of Commerce ("Commerce") in the antidumping duty investigation of Certain Corrosion-Resistant Steel Products from Mexico.

JURISDICTION

1.  This action arises out of an antidumping duty investigation conducted by Commerce pursuant to Section 731 of the Tariff Act of 1930, as amended (the "Act"), 19 U.S.C. § 1673. Commerce published notice of the final results of the investigation in the *Federal Register* on August 29, 2025. *See Certain Corrosion-Resistant Steel Products From Mexico: Final Affirmative Determination of Sales at Less Than Fair Value*; 90 Fed. Reg. 42187 (August 29, 2025) (hereinafter referred to as the "*Final Results*").

2.  This action is commenced pursuant to Sections 516A(a)(2)(A)(i), 516A(a)(2)(B)(i), 516A(g)(3)(A)(i), and 516A(g)(3)(B) of the Act, as amended, 19 U.S.C. §§ 1516a(a)(2)(A), (B)(i), (g)(3)(A)(i), and (g)(3)(B). Section 516A(g)(3)(A)(i) of the Act, 19 U.S.C. § 1516a(g)(3)(A)(i), permits review of final determinations by Commerce in cases involving United States-Mexico-Canada Trade Agreement ("USMCA") countries

when review by a binational panel has not been requested. Consequently, this Court has jurisdiction over this matter by reason of 28 U.S.C. § 1581(c), which confers upon the Court exclusive jurisdiction over civil actions commenced under Section 516A of the Act.

PLAINTIFF'S STANDING TO COMMENCE THIS ACTION

3.  Plaintiff is a producer and exporter of corrosion-resistant steel products from Mexico, the subject merchandise at issue in this appeal. Plaintiff participated as a respondent in the antidumping duty investigation that is the subject of this appeal. Accordingly, Plaintiff is an "interested party" within the meaning of section 771(9)(A) of the Tariff Act, as amended, 19 U.S.C. § 1677(9)(A), and has standing to commence this action pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

TIMELINESS OF THIS ACTION

4.  On August 29, 2025, the *Final Results* were published in the *Federal Register*. *See Certain Corrosion-Resistant Steel Products From Mexico: Final Affirmative Determination of Sales at Less Than Fair Value*; 90 Fed. Reg. 42187 (August 29, 2025). The antidumping duty order was published in the *Federal Register* on December 19, 2025. *See Corrosion-Resistant Steel Products From Brazil and Mexico: Amended Final Antidumping Duty Determination; Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Turkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 90 Fed. Reg. 59494 (December 19, 2025).

5.  On September 18, 2025, Plaintiff filed a Notice of Intent to Commence Judicial Review with the United States Secretariat under the United States-Mexico-Canada

Agreement within the time specified by Section 516A(g)(3) of the Act, 19 U.S.C. § 1516a(g)(3)(B).

6. Plaintiffs initiated this action by filing a Summons on January 23, 2026, within the 30-day period that began to run 31 days after the date of publication of the final determination being challenged here, pursuant to 19 U.S.C. § 1516a(a)(5)(A). Plaintiff is filing this Complaint within 30 days after filing the Summons. The Summons and Complaint are therefore filed within the time specified by Section 516A(a)(5) of the Act, 19 U.S.C. § 1516a(a)(5)(A); 28 U.S.C. § 2636(c); and Rule 3(a)(2) of the Rules of this Court. Accordingly, this action is timely filed pursuant to the relevant statutory provisions, which permit parties to challenge final determinations that involve a USMCA country by filing a notice of intent to commence judicial review 20 days after the publication of the final determination, filing a summons between the 31st and 60th day after the publication of the antidumping duty order, and filing a complaint within 30 days thereafter.[1]

---

[1] The statute provides a special rule for the time limits for filing a summons and complaint in an action appealing a determination involving imports from a USMCA country:

> Notwithstanding any other provision of this subsection, in the case of a determination to which the provisions of subsection (g) apply, an action under this subsection may not be commenced, and the time limits for commencing an action under this subsection shall not begin to run, until the day specified in whichever of the following subparagraphs applies:
>
> (A) For a determination described in paragraph (1)(B) or clause (i), (ii) or (iii) of paragraph (2)(B), the 31st day after the date on which notice of the determination is published in the Federal Register.

19 U.S.C. 1516a(5)(A). We believe that there is some potential ambiguity as to whether this provision requires the summons to be filed between 31 and 60 days after publication of the final determination, or whether it instead requires the summons to be filed between 31 and 60 days after publication of the antidumping order. To avoid any uncertainty, we filed a summons and complaint initiating a separate appeal between 31 and 60 days after

*(footnote continued on following page)*

STATEMENT OF FACTS

7. On September 5, 2024, Steel Dynamics, Inc. Nucor Corporation, United States Steel Corporation, Wheeling-Nippon Steel, Inc., and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (collectively, "Petitioners") filed a petition with Commerce and the U.S. International Trade Commission alleging, *inter alia*, that Certain Corrosion-Resistant Steel products imported from Mexico were being sold at less than fair value in the United States within the meaning of Section 731 of the Act. Commerce initiated the less-than-fair-value investigation of Certain Corrosion-Resistant Steel Products from Mexico on October 2, 2024. Commerce selected Galvasid and Ternium Mexico S.A. de C.V. as the mandatory respondents in the investigation on October 21, 2024.

8. Commerce issued its initial questionnaire to Galvasid on November 18, 2024. The questionnaire's instructions for reporting revenues in both the U.S. market and home-market stated:

> The gross unit price less price adjustments should equal the net amount of revenue received from the sale. *If the invoice to your customer*

---

*(footnote continued from previous page)*
publication of the final determination on October 28, 2025 (docketed under case number 25-00235).

For the sake of completeness, it should be noted that we filed a summons and complaint initiating a separate appeal between 31 and 60 days after publication of the final determination on October 27 (docketed under case number 25-00234). However, on October 27, we were contacted by the Case Manager at the Court of International Trade who informed us that the Summons was not in proper form because it did not correctly identify the Clerk of the Court. On October 28, we corrected this error by timely filing a new Summons, docketed under case number 25-00235, that correctly identified the Clerk of the Court. As a result, the appeal commenced on October 27 and docketed under case number 25-00234 became superfluous, and Plaintiff filed a Motion to Dismiss that appeal without prejudice on October 31. *See* ECF No. 7. The Motion to Dismiss was granted on December 8 and that case was dismissed without prejudice. *See* ECF No. 11.

> *includes separate charges for other services directly related to the sale, such as a charge for shipping, create a separate field for reporting each additional charge.*[2]

9. In accordance with the schedule established by Commerce, Galvasid timely submitted its responses to Commerce's initial and supplemental questionnaires between December of 2024 and March of 2025. In its January 13, 2025, response to Section C of Commerce's initial questionnaire, Galvasid explicitly informed Commerce that its U.S. sales were made either on a DDP or CIF basis.[3] Furthermore, the database containing a sale-by-sale listing of U.S. sales that was submitted by Galvasid as part of its response reported the sales terms for all U.S. sales as either DDP or CIF.[4]

10. "DDP" and "CIF" are defined International Commerce Terms ("INCOTERMs") that assign *to the seller* the costs of freight for, and risk of loss during, shipment of the goods to a designated destination. For sales made on a DDP (or "Delivered Duty Paid") basis, the seller is responsible for all costs associated with delivery of the goods to the location designated by the customer (including any import duties), and the risk of loss transfers to the buyer when the goods are delivered.[5] For sales made on a CIF (or "Cost, Insurance, and Freight") basis, the seller is responsible for the costs associated with

---

[2] Commerce's November 18, 2024, Initial Questionnaire at B-18 and C-16 (emphasis added).

[3] *See* Galvasid's January 13, 2025, Section C Response at 14.

[4] *See* Galvasid's March 20, 2025, Submission at Appendix S3C-1.

[5] *See, e.g., United States Steel v. United States,* 569 F. Supp. 3d 1296, 1301, n.4 ("According to Incoterms, 'Delivered Duty Paid' means that the seller delivers the goods when the goods are placed at the disposal of the buyer, cleared for import on the arriving means of transport ready for unloading at the named place of destination. The seller bears all the costs and risks involved in bringing the goods to the place of destination and has an obligation to clear the goods not only for export but also for import, to pay any duty for both export and import and to carry out all customs formalities.").

delivery of the goods to the port designated by the customer, and the risk of loss transfers to the buyer when the goods reach the destination port.[6] Consequently, the prices for DDP and CIF sales necessarily include freight and insurance.[7]

11. Galvasid's January 13 Section C response also explained that, because freight was included in the invoice price under these sales terms, the related expenses had been reported separately as items to be deducted from the reported gross unit price.[8] For example, Galvasid stated that:

---

[6] *See, e.g., Biodiesel from the Republic of Argentina: Final Affirmative Countervailing Duty Determination,* 82 Fed. Reg. 53477 (Nov. 16, 2017). and accompanying Issues and Decision Memorandum, Nov. 6, 2017, at Comment 3 ("The CIF terms indicate that the price includes international freight and insurance."); *Certain Steel Concrete Reinforcing Bars from Turkey; Final Results, Rescission of Antidumping Duty Administrative Review in Part, and Determination To Revoke in Part,* 70 Fed. Reg. 67665, and accompanying Issues and Decision Memorandum, Nov. 8, 2005, at Comment 22 ("{T}he terms CFR and CIF denote that 'the seller delivers when the goods pass the ship's rail in the port of shipment. The seller must pay the costs and freight necessary to bring the goods to the named port of destination but the risk of loss of damage to the goods, as well as any additional costs due to events occurring after the time of delivery, are transferred from the seller to the buyer.'"). *See also China National Machinery Import & Export Corp. v. United States*, 264 F. Supp. 2d 1229, 1238, n.14 (Ct. Int'l Trade 2003) (In calculating surrogate values in non-market economy cases, "Commerce may adjust data by adding ocean freight and marine insurance costs ('F & I'), as long as such adjustment is reasonable. 'F.O.B.' or 'Free-On-Board' prices do not include F & I whereas 'C.I.F.' or 'Cost-Insurance-and-Freight' prices do.").

[7] 19 U.S.C. § 1677a(c)(2)(A) provides that:

> The price used to establish export price and constructed export price shall be ... reduced by ... the amount, if any, *included in such price*, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States....

(emphasis added).

[8] *See* Galvasid's January 13, 2025, Section C Response at 27-28.

> Galvasid's sales of CORE products to Puerto Rico during the investigation period were made on a CIF basis. The merchandise for those sales was transported from Galvasid's plant in Apodaca to the port of Altamira by unaffiliated trucking companies, and then from the port to Puerto Rico by unaffiliated marine transport carriers. The cost for transport from Galvasid's Apodaca plant to the port of Almira has been reported in the "DINLFTPU" field in the sales listing provided in Appendix C-1, and the cost of sea transport to Puerto Rico has been reported in the "INTNFRU" field. The calculation of the reported international freight cost for a sample transaction is provided in Appendix C-12.
>
> Galvasid's other sales of CORE products to U.S. customers during the investigation period were made through direct shipments on a DDP basis from Galvasid's plant in Apodaca to the destination in the United States designated by the unaffiliated U.S. customer. The merchandise was transported from Galvasid's Apodaca plant to the destination designated by the customer using unaffiliated trucking companies..... The cost of transportation for shipments ... has been reported in "INTNFRU" field in the sales listing provided in Appendix C-1.[9]

Moreover, Galvasid's Section C response explained that Galvasid had not obtained outside insurance for its U.S. sales, but instead self-insured U.S. sales made on a CIF basis by compensating the customer for any losses during transit directly from its own funds. As Galvasid's response explained:

> Galvasid's sales of CORE products to Puerto Rico during the investigation period were made on a CIF basis. Although the terms of sale made Galvasid responsible for losses during marine transport, Galvasid did not obtain marine insurance for these sales. Instead, in the event that the merchandise was damaged or lost during transport, Galvasid provided compensation to the customer directly.[10]

12. Galvasid's January 13 Section C response also provided a reconciliation of the total sales value of the U.S. sales reported in its sales listing to the total net sales revenue reported in its audited financial statements. That sales reconciliation identified the specific

---

[9] *Id.*

[10] *Id.* at 31.

accounts in which Galvasid recorded sales revenues for domestic and export sales in its normal accounting system.[11] The following table lists the accounts that were identified in the sales reconciliation as having positive sales revenues.

Accounts Identified in Sales Reconciliation
as Accounts in which Galvasid Recorded Sales Revenues[12]

| Account Number | Account Name (Spanish) | Account Name (English Translation) |
|---|---|---|
| 40010001 | Ventas Nacionales | National Sales |
| 40010002 | Ventas Nacionales Compañias Afiliadas | National Sales Affiliated Companies |
| 40030001 | Ventas de Exportación otros Paises | Export sales (other countries) |
| 40300001 | Carga y Descarga Mercancias | Loading and Unloading Goods |

The accounts in which Galvasid recorded other items that *reduced* net sales revenues (*i.e.,* discounts and returns) were also specifically identified in the sales reconciliation.[13]

13.  Commerce issued its preliminary affirmative determination on April 10, 2025. The preliminary dumping margin assigned to Galvasid was calculated based solely on the information submitted by Galvasid, without any application of any facts available.[14]

14.  Commerce conducted on-site verification of Galvasid's questionnaire responses in May of 2025. Notably, Commerce verified that Galvasid had correctly reported the sales terms for U.S. sales.[15] Commerce also verified that the reported U.S. prices reported

---

[11] *See id.* at Appendix C-3.

[12] *See id; see also* Galvasid's December 23, 2024, Section A Response at Appendix A-8-B.

[13] *See* Galvasid's January 13, 2025, Section C Response at Appendix C-3.

[14] *See Certain Corrosion-Resistant Steel Products from Mexico: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 90 Fed. Reg. 15349 (April 10, 2025), and accompanying Preliminary Decision Memorandum.

[15] *See* Commerce's July 11, 2025, Memorandum, *Verification of the Sales Response of Galvasid S.A. de C.V. (Galvasid) in the Antidumping Investigation of Certain Corrosion-Resistant Steel Products from Mexico* at 7-8, 14-15.

in the sales listings submitted by Galvasid corresponded to the prices stated on a DDP or CIF basis on Galvasid's invoices to its U.S. customers.[16]

15. Furthermore, the sales-related documentation reviewed by Commerce at verification for individual *U.S.* sales confirmed that the invoices did *not* separately identify amounts for freight or insurance to be charged to the U.S. customers.[17] Those documents also confirmed that, for internal accounting purposes, the sales revenues for individual U.S. sales were recorded, in part, in account 4003001, with the remainder recorded in account 4030001.[18] As mentioned, both of those accounts had been identified in the U.S. sales reconciliation provided in Galvasid's initial Section C response as accounts in which sales revenues were recorded.[19] The sales reconciliation indicated that account 4003001 was used to record "Export Sales," while account 4030001 was used to record revenues for "Loading and Unloading Goods."[20] The amounts recorded in account 40300001 reflected Galvasid's internal assignment of a portion of the total DDP and CIF amounts to freight and insurance.

16. There was no indication whatsoever in any of the documents examined by Commerce at verification that Galvasid's customer had access to the internal breakdown in Galvasid's normal accounting records or that Galvasid had informed the customer of *any* breakdown of the agreed-upon DDP or CIF prices between a price for the merchandise and

---

[16] *See id.*

[17] *See* Galvasid's May 22, 2025, Submission at Appendices 9-E to 9-H and 9-L to 9-N.

[18] *See id.*

[19] *See* Galvasid's January 13, 2025, Section C Response at Appendix C-3.

[20] *See id; see also* Galvasid's December 23, 2024, Section A response at Appendix A-8-B.

separate revenue for freight or insurance.[21] Furthermore, the payment information for U.S. sales that was reviewed by Commerce at verification demonstrated that the amounts paid by the U.S. customers matched the invoice prices and did not include any additional amounts for freight or insurance.[22]

    17.    As a separate matter, the exhibits reviewed by Commerce confirmed that the invoices for some *home-market* sales *did* separately identify amounts for freight or insurance to be charged to home-market customers.[23]

    18.    Commerce issued its report on its verification of Galvasid's sales information on July 11, 2025. The sales verification report stated that:

> In our review of the U.S. sales reconciliation and selected sales traces, we found that Galvasid included *freight revenue and insurance revenue,* which *were separately listed on the sale invoices for Galvasid's U.S. sales*, in Galvasid's calculation of U.S. gross unit price.[24]

However, the assertion in the verification report that "freight revenue and insurance revenue ... were separately listed on the sale *invoices* for Galvasid's U.S. sales" was incorrect.[25] The invoices for U.S. sales that were examined at verification only listed the

---

[21] *See* Galvasid's May 22, 2025, Submission at Appendices 9-E to 9-H and 9-L to 9-N.

[22] *See id.*

[23] *See id.* at Appendices 9-A to 9-D and 9-I to 9-K.

[24] Commerce's July 11, 2025, Memorandum, *Verification of the Sales Response of Galvasid S.A. de C.V. (Galvasid) in the Antidumping Investigation of Certain Corrosion-Resistant Steel Products from Mexico* at 2.

[25] *See Certain Corrosion-Resistant Steel Products from Mexico: Final Affirmative Determination of Sales at Less Than Fair Value,* 90 Fed. Reg. 42187 (Aug. 29, 2025), and accompanying Issues and Decision Memorandum at 48.

prices for U.S. sales on a DDP or CIF basis, without providing any separate listing or other breakdown of "freight revenue" or "insurance revenue."[26]

19. Interested parties submitted their case and rebuttal briefs in July and August of 2025. In their July 28 Case Brief, Petitioners argued that "Galvasid improperly included freight revenue and insurance revenue in its U.S. gross unit prices, inflating U.S. prices and decreasing its dumping margin," and suggested that the Department should make an adjustment based on "facts available" to Galvasid's reported U.S. gross unit prices.[27] Petitioners also argued that Galvasid's reporting of gross unit price was inconsistent between the U.S market and home-market.[28] At the same time, Petitioners' Case Brief also cited and discussed the details of the verification exhibits — which, as discussed above, demonstrated conclusively that Petitioners' claims were false.[29]

20. Galvasid responded to Petitioners' arguments in a Rebuttal Brief submitted on August 4. In that brief, Galvasid explained that its U.S. sales were made on a DDP or CIF basis; that it had reported that its U.S. sales were made on that basis in its initial questionnaire response; that, as a matter of law, sales on a DDP or CIF basis make the seller responsible for freight for, and for the risk of loss during, transit to the designated delivery location.[30] Galvasid's Rebuttal Brief also specifically identified the verification exhibits that demonstrated that the invoices and other documents shared with its U.S. customers did not provide any breakdown of the DDP and CIF prices, and that the only

---

[26] *See* Galvasid's May 22, 2025, Submission at Appendices 9-E to 9-H and 9-L to 9-N.

[27] *See* Petitioners' July 28, 2025, Case Brief at 2, 19-20.

[28] *See id.* at 17-18.

[29] *See id.*

[30] *See* Galvasid's August 4, 2025, Rebuttal Brief at 16-17.

breakdown of those prices was in the purely-internal accounting vouchers recorded in the sales in Galvasid's normal accounting records.[31]  And, finally, Galvasid's Rebuttal Brief identified the *separate* verification exhibits showing that, for some *home-market* sales, the invoices sent by Galvasid to its customers did separately identify amounts for the merchandise and for additional freight and insurance charges.[32]  Those amounts (and only those amounts) had been reported as freight or insurance revenue in Galvasid's home-market sales listing.[33]

21.  Commerce issued its final affirmative determination on August 29, 2025.  In its final determination, Commerce calculated a 24.05 percent weighted-average dumping margin for Galvasid — an increase of almost 10 percentage points from the preliminary determination.[34]  This increase was due almost entirely to Commerce's decision to apply partial adverse facts available ("AFA") to reduce Galvasid's reported U.S. gross unit prices by an estimated amount "to account for the freight and insurance revenue included in Galvasid's reported gross unit prices."[35]

22.  Notably, Commerce's final determination acknowledged that the "verification report inadvertently stated, incorrectly, that freight revenue was separately listed on the U.S. sales invoices."[36]  Nevertheless, Commerce's final determination concluded that:

---

[31] *See id.* at 17-18 and Attachment 1.

[32] *See id.* at 21 and Attachment 2.

[33] *See id.* at 3.

[34] *See Certain Corrosion-Resistant Steel Products from Mexico: Final Affirmative Determination of Sales at Less Than Fair Value,* 90 Fed. Reg. 42187 (Aug. 29, 2025) and accompanying Issues and Decision Memorandum.

[35] *See id.* at cmt. 12.

[36] *Id*.

> Galvasid failed to disclose in its questionnaire responses that it had included freight revenue and insurance revenue in its reported U.S. gross unit prices, or that it received these revenues in the U.S. market at all.[37]

The final determination did not explain why Commerce believed that Galvasid's prices included separate "freight revenue" and 'insurance revenue," when the documents reviewed at verification demonstrated conclusively: (1) that the reported U.S. prices matched the DDP and CIF prices stated on Galvasid's invoices for U.S. sales, (2) that those invoices did not provide any further breakdown of the DDP and CIF prices, and (3) that the amounts paid by the customers matched the invoice prices and did not include any additional payments to compensate Galvasid for freight or insurance.[38]

23. Galvasid filed a letter on September 2, 2025, asking that Commerce correct its erroneous application of partial AFA to Galvasid's U.S. gross unit prices in the final determination. In its letter, Galvasid explained (once more) that there was no separate or additional freight revenue or insurance revenue on its U.S. sales.[39] Furthermore, Galvasid's letter also explained that Commerce's decision had overlooked the following facts:

(1) Galvasid had reported in its Section C response that its U.S. sales were made on either a DDP or CIF basis;

---

[37] *Id.*

[38] *See id; see also* Galvasid's May 22, 2025, Submission at Appendices 9-E to 9-H and 9-L to 9-N.

[39] *See* Galvasid's September 2, 2025, Letter at 6-7.

> (2) As a matter of law, the DDP and CIF sales terms made Galvasid responsible for freight for, and the risk of loss during, transit of the merchandise to the location designated by the customer; and
>
> (3) The *expenses* incurred by Galvasid for freight to transport the merchandise to the U.S. customers had been separately reported in Galvasid's U.S. sales listing.[40]

Galvasid's September 2 letter also explained that Commerce's initial questionnaire had expressly indicated that it was not necessary for the respondents to disaggregate DDP and CIF invoice prices to separately identify and report amounts for freight and insurance included in those prices.[41] Instead, as described above, Commerce's questionnaire stated that respondents should report additional "revenues" *only if* the amount of freight and insurance included in the invoice price was separately identified on the invoice to its customers.[42]

24. On September 8, 2025, Petitioners filed a response to Galvasid's September 2 letter. In their September 8 letter, Petitioners defended Commerce's application of partial AFA to Galvasid's U.S. gross unit prices and again claimed, falsely, that Galvasid had not reported its revenues in the form or manner requested by Commerce.[43]

25. On September 11, 2025, Galvasid filed a letter requesting, *inter alia*, that Commerce commence an inquiry pursuant to Section 351.313 of its regulations into the

---

[40] *See id.* at 2-5.

[41] *See id.* at 4-5.

[42] *See id.*

[43] *See* Petitioners' September 8, 2025, Letter at 4.

conduct of Petitioners' counsel. In that letter, Galvasid explained that Petitioners' arguments regarding Galvasid's U.S. sales revenue in their July 28 case brief and September 8 letter were false, constituted improper conduct (as that term has been defined by Commerce), and warranted sanctions under Section 351.313 of Commerce's regulations.[44]

26. On September 16, 2025, Commerce issued a memorandum rejecting Galvasid's September 11 letter as an untimely "surrebuttal" and stating that Galvasid's letter would be removed from the record. Commerce did not address Galvasid's request that Commerce commence an inquiry into the conduct of Petitioners' counsel.[45]

27. On September 26, 2025, Commerce issued its response to Galvasid's September 2 letter requesting a correction of the final determination. Commerce's September 26 letter did not state that the correction requested by Galvasid was outside the scope of Commerce's authority to correct its determinations.[46] Instead, Commerce took the position that its final determination had correctly found that Galvasid had failed to report requested information.[47] In this regard, Commerce asserted that the fact that Galvasid had reported that its U.S. sales were made on a DDP or CIF basis was not, by

---

[44] *See* Galvasid's September 11, 2025, Letter at 2-5.

[45] *See* Commerce's September 16, 2025, Memorandum, *Rejection of Galvasid's September 11, 2025, Request to Reject the Petitioners' Rebuttal Comments and Providing Galvasid an Opportunity to Submit Rebuttal Comments*.

[46] *See* Commerce's September 26, 2025, Memorandum, *Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from Mexico: Analysis of Ministerial Error Allegations for the Final Determination*.

[47] *See id.* at 5-8.

itself, sufficient to explain that had Galvasid "incurred" freight and insurance revenue.[48] Instead, according to Commerce's memorandum,

> The record remains unclear regarding when and how Galvasid charged for freight and insurance revenue, and how Galvasid was accounting for such revenue in both its accounting system and its invoice prices. [49]

Tellingly, Commerce once more failed to identify any evidence whatsoever indicating that Galvasid's U.S. customers had paid one penny more than the DDP or CIF price stated on the invoice.[50] Nor did it identify any evidence that Galvasid and its U.S. customers had negotiated any separate amounts for freight or insurance.[51]

28. As a separate matter, Commerce's September 26 letter also noted that Galvasid's U.S. sales listing had failed to report any insurance expenses for the U.S. sales that were reported to have been made on a CIF basis. According to Commerce, the absence of such expenses raised questions about the reporting of the sales terms for Galvasid's U.S. sales:

> Regarding insurance revenue, while Galvasid reported a freight expense for all of its U.S. sales with CIF sales terms, it did not separately report an insurance expense for these sales in its U.S. sales database. Thus, a review of the record demonstrates that Galvasid's sales terms do not match its reporting, even for expenses.[52]

In reality, however, this alleged discrepancy had been fully explained by Galvasid in its initial Section C response, which (as detailed above) had explained that Galvasid did not

---

[48] *See id.* at 6-7.

[49] *Id.*

[50] *See id.*

[51] *See id.*

[52] *Id.* at 6.

obtain outside insurance for its U.S. sales, but instead compensated the customer for any losses during transit directly from its own funds.[53]

29. On December 19, 2025, Commerce published the antidumping duty order in the *Federal Register*. *See Corrosion-Resistant Steel Products From Brazil and Mexico: Amended Final Antidumping Duty Determination; Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Turkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 90 Fed. Reg. 59494 (December 19, 2025).

STATEMENT OF CLAIMS

30. In this appeal, Plaintiff challenges Commerce's final determination in the antidumping duty investigation on *Certain Corrosion-Resistant Steel Products from Mexico*, and, in particular, Commerce's determination that Galvasid received, but did not report, additional revenues for freight and insurance for its U.S. sales, and Commerce's consequent application of partial AFA to Galvasid's reported U.S. gross unit prices to account for the allegedly unreported revenues. Commerce's determination was arbitrary and capricious, unsupported by substantial evidence on the record, or otherwise not in accordance with law, for the following reasons, among others:

(1) The instructions in Commerce's initial questionnaire did not require Galvasid to separately report the amount of freight and insurance included in the invoice price as "revenue" for Galvasid's U.S. sales when freight and insurance revenue were not separately identified on the invoices to its U.S. customers.

---

[53] *See supra* note 9.

(2) Record evidence demonstrates that Galvasid's initial questionnaire response fully disclosed to Commerce that the invoice prices for Galvasid's U.S. sales reflected Galvasid's obligation to transport the merchandise to the designated delivery point, and to bear the risk of loss during that transport, because, *inter alia*, Galvasid reported in its U.S. sales listing that all of its U.S. sales were made either on a DDP or CIF basis.

(3) There was no evidence to suggest that Galvasid's U.S. sales invoices separately identified amounts for freight or insurance revenues, or that Galvasid separately negotiated the amounts for freight or insurance revenues with its U.S. customers. There was no evidence that Galvasid earned any additional revenue for freight or insurance on its U.S. sales. The evidence confirmed that the customers paid the DDP or CIF price specified in the invoice and no more.

(4) Under the well-established precedents of Commerce and this Court, in the absence of evidence that Galvasid separately negotiated amounts for freight or insurance revenue with its U.S. customers, Commerce may not rely on purely internal company documents to determine whether there is a separate service-related revenue that may be "capped."

(5) There was no basis for application of partial adverse facts available because Galvasid timely provided Commerce with accurate data and full sets of documents generated in the normal course of business, and there were no gaps in the record that would require Commerce to resort to use of facts otherwise available for Galvasid's U.S. gross unit prices.

31. In addition, Plaintiff contends that Commerce's rejection of Galvasid's letter dated September 11, 2025, and its failure to initiate proceedings to assess whether action

should be taken against Petitioners' counsel pursuant to Section 351.313 of its regulations, was unlawful and an abuse of discretion.

32.  Finally, Plaintiff contends (1) that no official acting in good faith could possibly have concluded that Galvasid had received separate freight and insurance revenue on its U.S. sales or that Galvasid had improperly failed to report that non-existent revenue, (2) that Commerce's insistence on applying partial AFA to Galvasid due to the alleged failure to report the non-existent revenue is *prima facie* evidence of bad faith by the Commerce officials responsible for the decision in this case, and (3) that remedial action by the Court to prevent continuation or recurrence of that bad-faith conduct is necessary.

## DEMAND FOR JUDGMENT

33.  WHEREFORE, Plaintiff respectfully requests this Court to:

(1)  Declare Commerce's *Final Results* to be arbitrary and capricious, unsupported by substantial evidence on the record, and otherwise not in accordance with law;

(2)  Remand this matter to Commerce for disposition in a manner consistent with the judgment of this Court;

(3)  Provide such other relief as this Court deems appropriate.

        Respectfully submitted,

        <u>/s/Jeffrey M. Winton</u>
        Jeffrey M. Winton
        Michael J. Chapman
        Amrietha Nellan
        Vi N. Mai
        Rachel Hauser

        WINTON & CHAPMAN PLLC
        1100 13th Street NW, Suite 825
        Washington, DC  20005
        (202) 774-5500

        Attorneys for Galvasid S.A. de C.V.

Dated:  January 23, 2026