UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| GALVASID S.A. DE C.V., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Court No. 26-00825 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant. ) | |
| ) | |

ORDER

Upon consideration of the Rule 56.2 Motion of Plaintiff Galvasid S.A. de C.V. ("Galvasid")

for Judgment on the Agency Record, all responses thereto, and all other relevant record

information, it is hereby

ORDERED that Galvasid's Rule 56.2 Motion for Judgment on the Agency Record is granted;

and it is further

ORDERED that the final determination by the U.S. Department of Commerce ("Commerce"),

as set forth in *Certain Corrosion-Resistant Steel Products From Mexico: Final Affirmative*

*Determination of Sales at Less Than Fair Value*; 90 Fed. Reg. 42187 (August 29, 2025); as

amended in *Corrosion-Resistant Steel Products From Brazil and Mexico: Amended Final*

*Antidumping Duty Determination; Corrosion-Resistant Steel Products From Australia, Brazil,*

*Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Turkiye, the United*

*Arab Emirates, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 90 Fed. Reg.

59494 (Dec. 19, 2025)  is reversed and remanded for disposition in a manner consistent with the

judgment of this Court.

Signed: _____

Jane A. Restani, Judge

Dated: _____

New York, NY

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JANE A. RESTANI, JUDGE

|  | ) |  |
|---|---|---|
| GALVASID S.A. DE C.V., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 26-00825 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

MOTION OF PLAINTIFF GALVASID S.A. DE C.V.
FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff

Galvasid S.A. de C.V. ("Galvasid") hereby moves for judgment on the agency record in

the above-referenced action.  For the reasons set forth in Galvasid's Brief in Support of Its

Rule 56.2 Motion for Judgment on the Agency Record, Galvasid requests that the Court

hold that the final determination by the U.S. Department of Commerce ("Commerce"), as

set forth in *Certain Corrosion-Resistant Steel Products From Mexico: Final Affirmative*

*Determination of Sales at Less Than Fair Value*; 90 Fed. Reg. 42187 (August 29, 2025), as

amended in *Corrosion-Resistant Steel Products From Brazil and Mexico: Amended Final*

*Antidumping Duty Determination; Corrosion-Resistant Steel Products From Australia,*

*Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Turkiye,*

*the United Arab Emirates, and the Socialist Republic of Vietnam: Antidumping Duty*

*Orders*, 90 Fed. Reg. 59494 (Dec. 19, 2025), is not supported by substantial evidence on

the record and is not otherwise in accordance with the law, and that the Court therefore

remand this matter to Commerce for disposition in a manner consistent with the judgment of this Court.

Respectfully submitted,

/s/Jeffrey M. Winton

Jeffrey M. Winton
Amrietha Nellan
Vi N. Mai
Rachel Hauser

WINTON & CHAPMAN PLLC
1100 13th St., N.W., Suite 825
Washington, D.C. 20005
(202) 774-5500

Attorneys for Galvasid S.A. de C.V.

January 30, 2026

Public Version

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JANE A. RESTANI, JUDGE

|  |  |
|---|---|
| GALVASID S.A. DE C.V., | ) |
| Plaintiff, | ) |
| v. | ) Court No. 26-00825 |
| UNITED STATES, | ) |
| Defendant. | ) |

PLAINTIFF'S BRIEF IN SUPPORT OF
ITS RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

PUBLIC VERSION

PROPRIETARY INFORMATION
REMOVED FROM PAGES 8 AND 29

WINTON & CHAPMAN PLLC
1100 13th Street NW, Suite 825
Washington, DC  20005
(202) 774-5500

Attorneys for Galvasid S.A. de C.V.

January 30, 2026

Table of Contents

STATEMENT PURSUANT TO RULE 56.2(C)(1) ................................................................. 1

    A.   Administrative Determination under Review ........................................................ 1

    B.   Issues of Law and Summary of Reasons for Reversing Commerce's
        Determination .................................................................................................... 2

STATEMENT ON JURISDICTION ...................................................................................... 5

STATEMENT OF FACTS .................................................................................................. 8

ARGUMENT ................................................................................................................. 20

    A.   Commerce's Assertion that Galvasid Had Failed to Report  Additional
        Freight or Insurance Revenue in the Manner  Requested Is False, and
        Wholly without Support in the Record ................................................................ 20

        1.   Record Evidence Confirms that Galvasid Had No Additional
             Revenue for Freight or Insurance on Its U.S. Sales .................................... 20

             a.   Because Galvasid's U.S. Sales Were Made on a DDP or  CIF
                 Basis, the Per-Unit Invoice Prices Necessarily Included
                 Both the Cost of Transport to the Customer and the Value of
                 Galvasid's Assumption of the Risk of Loss during Transit ............... 20

             b.   Documents Reviewed by Commerce at Verification
                 Confirm that the Price Received by Galvasid Was Exactly
                 Equal to the DDP and CIF Invoice Price and that No
                 Additional Amounts were Paid by the Customer ............................... 24

        2.   The Past Decisions by Commerce and the Court Confirm  that a
             Respondent Is Not Required to Disaggregate Its  Invoice Prices
             into Separate Fields Based on a Purely  Internal Breakdown of a
             DDP or CIF Invoice Price ........................................................................ 25

    B.   Commerce's Application of Adverse Facts Available  to Adjust
        Galvasid's U.S. Prices was Unlawful ................................................................ 27

        1.   Commerce Never Requested Information on the Purely  Internal
             Breakdown of Galvasid's U.S. Sales Prices ............................................. 28

        2.   Information on Galvasid's Purely Internal Breakdown of  Its DDP
             and CIF U.S. Sales Prices Was Not "Necessary" ..................................... 29

CONCLUSION ............................................................................................................... 30

<u>Table of Authorities</u>

<u>C</u>ASES

*ABB Inc. v. United States,*
    355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018)...................................................................... 26

*American Cast Iron Pip Co. v. United States,*
    405 F.Supp.3d 1378, 1383-84 (Ct. Int'l Trade Oct. 16 2019)........................................ 7

*Bhullar v. United States,*
    27 C.I.T. 532, 538-539 (Ct. Int'l Trade Mar. 26, 2003).................................................. 7

*Bioparques de Occidente S.A de C.V. v. United States,*
    31 F.4th 1336, 1347 (Fed. Cir. Apr. 14, 2022)............................................................... 6

*China National Machinery Import & Export Corp. v. United States,*
    264 F. Supp. 2d 1229 (Ct. Int'l Trade 2003).................................................................. 22

*Clearon Corp. v. United States,*
    359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019).................................................................. 30

*Hyundai Heavy Industries Co., Ltd. v. United States,*
    393 F. Supp. 3d 1293 (Ct. Int'l Trade 2019).................................................................. 26

*NEXTEEL v. United States,*
    28 F.4th 1226 (Fed. Cir. 2022)....................................................................................... 25

*Queen's Flowers de Colombia v. United States,*
    981 F. Supp. 617 (Ct. Int'l Trade 1997)........................................................................ 28

*Saha Thai Steel Pipe v. United States,*
    605 F. Supp. 3d 1348 (Ct. Int'l Trade 2022).................................................................. 28

*SKF USA v. United States,*
    391 F. Supp. 2d 1327 (Ct. Int'l Trade 2005).................................................................. 28

*United States v. Katana Racing, Inc.,*
    569 F. Supp. 3d 1296 (Ct. Int'l Trade 2023).................................................................. 21

<u>S</u>TATUTES

19 U.S.C. § 1516a(g)(1)(B)....................................................................................................... 7

19 U.S.C. § 1516a(g)(3)(A)(i),.............................................................................................. 5,7

19 U.S.C. § 1516a(g)(3)(B)..................................................................................................... 5,6

Public Version

19 U.S.C. § 1677e ............................................................................ 27

28 U.S.C. § 1581(c) ......................................................................... 6

ADMINISTRATIVE DECISIONS

*Biodiesel from the Republic of Argentina: Final*
  *Affirmative Countervailing Duty Determination,*
  82 Fed. Reg. 53477 (Nov. 16, 2017) ................................................ 21

*Certain Preserved Mushrooms From the Netherlands: Final*
  *Affirmative Determination of Sales at Less Than Fair Value,*
  88 Fed. Reg. 18115 (Mar. 27, 2023) ............................................... 23

*Certain Steel Concrete Reinforcing Bars from Turkey;*
  *Final Results, Rescission of Antidumping Duty Administrative*
  *Review in Part, and Determination To Revoke in Part,*
  70 Fed. Reg. 67665 (Nov. 8, 2005) ................................................. 21

*Common Alloy Aluminum Sheet from India: Final Results of*
  *Antidumping Duty Administrative Review; 2020-2022,*
  88 Fed. Reg. 76724 (Nov. 7, 2023) ........................................... 23, 26

*Polyester Textured Yarn from Thailand: Final Affirmative*
  *Determination of Sales at Less Than Fair Value,*
  86 Fed. Reg. 58883 (Oct. 25, 2021) .......................................... 22, 26

*Welded Stainless Pressure Pipe From India:*
  *Amended Final Results of Antidumping Duty*
  *Administrative Review; 2020-2021,*
  88 Fed. Reg. 48442 (July 27, 2023) ................................................ 21

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JANE A. RESTANI, JUDGE



GALVASID S.A. DE C.V.,                    )
                                          )
                        Plaintiff,        )
                                          )
            v.                            )
                                          )    Court No. 26-00825
UNITED STATES,                            )
                                          )
                        Defendant.        )
                                          )
                                          )

PLAINTIFF'S BRIEF IN SUPPORT OF
ITS RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

This brief is submitted on behalf of Galvasid S.A. de C.V. ("Galvasid") to contest the

final determination by the U.S. Department of Commerce ("Commerce") in the

antidumping investigation of Certain Corrosion-Resistant Steel Products ("CORE") from

Mexico.[1]

STATEMENT PURSUANT TO RULE 56.2(C)(1)

A.    *Administrative Determination under Review*

Commerce published the notice of the final results of the investigation in the *Federal

Register* on August 29, 2025.[2]  Commerce's discussion of the issues raised in the final

results was set forth in a separate memorandum dated August 25, 2025.[3]

---

[1] On January 27, 2026, the Court entered an order directing parties to align the briefing
schedule for this case with the briefing schedule set forth in *Galvasid S.A. de C.V. v.
United States*, Ct. No. 1:25-cv-00235, and ordered that Galvasid's Rule 56.2 motion and
supporting brief for this case be due on January 30, 2026.  (ECF No. 9).

[2] *See Certain Corrosion-Resistant Steel Products From Mexico: Final Affirmative
Determination of Sales at Less Than Fair Value*; 90 Fed. Reg. 42187 (August 29, 2025)
(hereinafter referred to as the "*Final Results*") (Public Record ("PR") 482).

B.   *Issues of Law and Summary of Reasons*
     *for Reversing Commerce's Determination*

1.   *Whether Commerce's assertion that Galvasid had improperly failed to*
     *report the existence of "additional revenue" on its U.S. sales during the*
     *investigation period was supported by substantial evidence or, indeed, by*
     *any evidence whatsoever?*

Commerce applied adverse facts available ("AFA") to Galvasid, increasing

Galvasid's dumping margin by close to 10 percentage points, based on the claim that

Galvasid had failed to inform the Department that Galvasid had received additional freight

and insurance revenue on its U.S. sales during the investigation period.  But Commerce's

claim simply has no factual basis.

Galvasid had informed Commerce in its very first questionnaire responses that all of

its U.S. sales were made either pursuant to DDP or CIF sales terms.  Galvasid further

explained that, under those terms, Galvasid was responsible for the cost of transporting the

merchandise to the designated location and that Galvasid bore the risk of any loss during

transit.  At verification, Commerce reviewed documents demonstrating that, for every

single examined U.S. sale, there were no separate amounts on the invoices (or in any

correspondence with the customers) for freight or insurance revenue.  The documents

presented at verification also showed that the amounts actually received by Galvasid for its

sales were precisely the same as the invoice amounts.

Documents presented at verification did show that, *for internal accounting purposes*

*only*, Galvasid split the amounts received from its customers into separate amounts for the

merchandise, for freight, and for insurance.  However, there is no evidence that these

---

*(footnote continued from previous page)*

[3] *See* Issues and Decision Memorandum for the Final Affirmative Determination of Sales
at Less Than Fair Value in the Investigation of Certain Corrosion-Resistant Steel Products
from Mexico (August 25, 2025) (hereinafter "Final I&D Memo") (PR-466).

purely internal allocations were ever communicated to the customers — because they were not.

Despite this clear evidence, Commerce somehow became convinced that Galvasid was hiding the existence of unreported additional revenue.  First, Commerce asserted, falsely, in its verification report that the U.S. sales invoices reviewed at verification *did* identify separate amounts for freight and insurance revenue.  After Galvasid demonstrated in a rebuttal brief that the verification report's assertion was false, Commerce's final determination conceded that the verification report was in error.  Nevertheless, Commerce applied adverse facts available to Galvasid because, Commerce asserted, "Galvasid failed to disclose in its questionnaire responses that it had included freight revenue and insurance revenue in its reported U.S. gross unit prices, or that it received these revenues in the U.S. market at all."

Galvasid requested that Commerce correct its final decision as a ministerial error because it was contrary to the facts — since Galvasid had, in fact, fully disclosed both that its sales were made on a DDP and CIF basis and that those terms required Galvasid to arrange transport to the designated location and to bear the risk of loss during transport.  Galvasid also pointed out that Commerce's questionnaire itself instructed respondents to report additional freight and insurance revenue only if those amounts were separately stated on the invoice.  Commerce rejected Galvasid's request on the grounds that "The record remains unclear regarding when and how Galvasid charged for freight and insurance revenue, and how Galvasid was accounting for such revenue in both its accounting system and its invoice prices."

Galvasid's questionnaire responses were absolutely clear and they followed Commerce's instructions to the letter.  The documents reviewed at verification

demonstrated without question that the payments received by Galvasid corresponded to the invoice amounts and that no additional amounts were received. They also demonstrated how those revenues were recorded in Galvasid's accounting records. There was no ambiguity and no justification for Commerce's claim that Galvasid had somehow withheld necessary information.

> 2. *Whether Commerce's application of adverse facts available to Galvasid was in accordance with law, when Galvasid's reporting followed the explicit instructions of Commerce's questionnaire?*

Commerce's initial questionnaire to Galvasid instructed Galvasid to report the terms of sale for each U.S. sale. The questionnaire also instructed Galvasid to report its unit prices as follows:

> The gross unit price less price adjustments should equal the net amount of revenue received from the sale. If the invoice to your customer *includes separate charges* for other services directly related to the sale, such as a charge for shipping, create a separate field for reporting each additional charge.

In accordance with these instructions, Galvasid reported that all of its U.S. sales had been made on either a DDP or CIF basis. Galvasid further explained that, under these terms, it was responsible for the cost of transport to the designated location and that it bore the risk of loss during that transport. Finally, Galvasid reported the unit prices for each transaction based on the amounts shown on its invoices. Documents provided in Galvasid's initial response for a sample U.S. sale demonstrated that the sale was made on a DDP basis, and that the invoice issued to the U.S. customer stated only a single invoice amount and did not identify any separate charges for "other services directly related to the sale." Because none of its invoices for U.S. sales identified separate amounts for "other services directly related to the sale," Galvasid followed the questionnaire's instruction and did not report any additional revenues in separate fields in its U.S. sales listing.

The documents presented by Galvasid at verification confirmed that none of Galvasid's invoices for U.S. sales identified separate amounts for "other services directly related to the sale."  They also confirmed that the payments received by Galvasid corresponded to the invoice amounts, and that Galvasid did not receive any additional amounts above those stated on the invoice.  However, because, for purely internal purposes, Galvasid's accounting records allocated the DDP and CIF prices between a merchandise amount and separate amounts for freight and insurance, Commerce decided to apply adverse facts available.

However, nothing in Commerce's questionnaire instructed Galvasid that it was supposed to describe whether it split up its DDP and CIF prices for internal purposes. Indeed, the past decisions by Commerce and the Courts have made clear that purely internal allocations of an invoice price should not be reported as separate revenue amounts.

This Court has previously held that "Commerce {has} its own obligation to ensure that {the respondent} was fully aware of what information the Department sought and the form in which it sought the data."  In other words, "Commerce must clearly and definitively ask for what it wants."  And an "alleged response deficiency cannot support application of {best information available} where the information sought was apparently never requested."  Basic fairness requires no less.  Commerce's determination in this case cannot be sustained.

STATEMENT ON JURISDICTION

This appeal is commenced pursuant to Sections 516A(a)(2)(A)(i), 516A(a)(2)(B)(i), 516A(g)(3)(A)(i), and 516A(g)(3)(B) of the Act, as amended, 19 U.S.C. §§ 1516a(a)(2)(A), (B)(i), (g)(3)(A)(i), and (g)(3)(B).  Section 516A(g)(3)(A)(i) of the Act, 19 U.S.C. §§ 1516a(g)(3)(A)(i), permits review of final determinations by Commerce in

cases involving United States-Mexico-Canada Trade Agreement ("USMCA") countries when review by a binational panel has not been requested.

As required under 19 U.S.C. § 1516a(g)(3)(B), Galvasid filed a Notice of Intent to Commence Judicial Review with the United States Secretariat under the USMCA on September 18, 2025, within 20 days after the publication of the Final Determination.[4] Galvasid then filed a summons and complaint initiating the appeal docketed under case number 25-00235 between 31 and 60 days after the publication of the Final Determination on October 28, 2025. We maintain that the Court has jurisdiction over the appeal docketed under case number 25-00235 by reason of 28 U.S.C. § 1581(c), which confers upon the Court exclusive jurisdiction over civil actions commenced under Section 516A of the Act.[5]

However, we also believe that there might be some ambiguity concerning the deadline under the statute for the commencement of an appeal of a final determination involving a free trade area country, where the final determination is amended by Commerce. In particular, in one case involving a free trade area country where Commerce issued amended final antidumping and countervailing duty determinations concurrently with the

---

[4] The Final Determination was published in the Federal Register on August 29, 2025. *See Certain Corrosion-Resistant Steel Products From Mexico: Final Affirmative Determination of Sales at Less Than Fair Value*; 90 Fed. Reg. 42187 (August 29, 2025) (hereinafter referred to as the "*Final Results*") (Public Record ("PR") 482). Therefore, under 19 U.S.C. § 1516a(a)(5)(A), the period for filing an appeal in this case began to run on September 29, with a summons due by October 29, and complaint due by November 28.

[5] As explained in Galvasid's January 26 Rule 56.2 motion and supporting brief filed in case number 25-00235, the Court of Appeals for the Federal Circuit has made clear that, pursuant to the special rules applicable to the judicial review of antidumping duty determinations involving free trade area countries (such as Mexico) provided in 19 U.S.C. § 1516a(g), parties may appeal a final antidumping duty determination involving a free trade area country *before* the antidumping duty order is published. *See Bioparques de Occidente S.A de C.V., et. al. v. United States, et. al.*, 31 F.4th 1336, 1347 (Fed. Cir. Apr. 14, 2022).

orders, this Court noted that it was permissible to commence an appeal during the period that commenced 31 days after the publication of the *amended* final determinations.[6]  It is our understanding that the Court's holding in that case meant only that, for cases where Commerce issues an amended final determination involving a free trade area country, parties may appeal the determination *either* between 31 and 60 days after the final determination (as Galvasid did in Court No. 25-00235), or between 31 and 60 days after the amended final determination.[7]  Nevertheless, out of an abundance of caution, Galvasid filed a summons and complaint initiating this appeal (docketed under case number 26-00825) on January 23, 2026, within the 30-day period that began to run 31 days after the publication of the amended final determination in this case.[8]  Accordingly, pursuant to 19 U.S.C. §§ 1516a(g)(1)(B), 1516a(g)(3)(A)(i), and the Court's holding in *Bhullar*, this action was timely filed, and the Court has jurisdiction to review the final determination at issue here, as well as in Court No. 25-00235.

---

[6] *See Bhullar v. United States*, 27 C.I.T. 532, 538-539 (Ct. Int'l Trade Mar. 26, 2003).

[7] This Court has confirmed that the Court's holding in *Bhullar* does *not* mean that parties must wait until the order is published to commence an appeal.  *See American Cast Iron Pip Co. v. United States*, 405 F.Supp.3d 1378, 1383-84 (Ct. Int'l Trade Oct. 16 2019) ("The {*Bhullar*} opinion then specifies May 22, 2002, the date of Federal Register publication of "the challenged determinations," which included the *amended* final affirmative LTFV determination and the *amended* final affirmative countervailing duty determination.  These were published together with the respective LTFV and countervailing duty orders.  Because in this instance Commerce did not issue an amended final LTFV determination after issuing the final LTFV determination, the only 20-day period that occurred began to run from the February 27, 2019 publication date.  Therefore, *Bhullar* is inapposite.").

[8] *See Corrosion-Resistant Steel Products From Brazil and Mexico: Amended Final Antidumping Duty Determination; Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Turkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 90 Fed. Reg. 59494 (Dec. 19, 2025) (amending the affirmative final determination of sales at less-than-fair-value for Mexico).

<u>STATEMENT OF FACTS</u>

On September 5, 2024, several U.S. producers of Corrosion-Resistant Steel ("Petitioners") filed a petition with Commerce and the U.S. International Trade Commission alleging, *inter alia*, that Certain Corrosion-Resistant Steel products imported from Mexico were being sold at less than fair value in the United States within the meaning of Section 731 of the Act.  Commerce formally initiated the investigation on October 2, 2024.

Commerce selected Galvasid as one of the mandatory respondents in the investigation and issued its initial questionnaire to Galvasid.  That questionnaire contained the following instructions for reporting revenues in both the U.S. and home-market:

> The gross unit price less price adjustments should equal the net amount of revenue received from the sale. *If the invoice to your customer includes separate charges for other services directly related to the sale, such as a charge for shipping, create a separate field for reporting each additional charge.*[9]

Galvasid's initial Section A response included documentation for a sample U.S. sale showing that the sale was made on a DDP [      ] basis, that the invoice listed only a single unit price (without any breakdown of separate amounts for freight or insurance), and that the amount paid by the customer corresponded precisely to the invoice amount.[10]  In its response to Section C of Commerce's initial questionnaire, Galvasid explicitly informed Commerce that *all* of its U.S. sales were made on either a DDP or CIF basis:

> As explained in Galvasid's Section A response, the U.S. sales of subject CORE products during the investigation period were made

---

[9] Commerce's November 18, 2024, Initial Questionnaire at B-18 and C-16 (emphasis added) (PR-111).

[10] *See* Galvasid's December 23, 2024, Section A Response, Appendix A-6-B, at pages 4, 6, 12, and 13 (PR-137, Confidential Record ("CR") 35).

primarily through direct shipments by Galvasid to the destination in the United States designated by the unaffiliated U.S. customer.  Sales to Puerto Rico were made on a CIF basis to an unaffiliated customer. Sales to other U.S. destinations were made on a DDP basis to the destination designated by the customer.[11]

Furthermore, the database containing a sale-by-sale listing of U.S. sales that was submitted by Galvasid as part of its response reported the sales terms for all U.S. sales as either DDP or CIF.[12]

Galvasid's initial Section C response also explained that, because freight was included in the invoice price under these sales terms, the related expenses had been reported separately as items to be deducted from the reported gross unit price.[13]  For example, Galvasid stated::

> Galvasid's sales of CORE products to Puerto Rico during the investigation period were made on a CIF basis.  The merchandise for those sales was transported from Galvasid's plant in Apodaca to the port of Altamira by unaffiliated trucking companies, and then from the port to Puerto Rico by unaffiliated marine transport carriers.  The cost for transport from Galvasid's Apodaca plant to the port of Almira has been reported in the "DINLFTPU" field in the sales listing provided in Appendix C-1, and the cost of sea transport to Puerto Rico has been reported in the "INTNFRU" field.  The calculation of the reported international freight cost for a sample transaction is provided in Appendix C-12.

> Galvasid's other sales of CORE products to U.S. customers during the investigation period were made through direct shipments on a DDP basis from Galvasid's plant in Apodaca to the destination in the United States designated by the unaffiliated U.S. customer.  The merchandise was transported from Galvasid's Apodaca plant to the destination designated by the customer using unaffiliated trucking companies.....

---

[11] *See* Galvasid's January 13, 2025, Section C Response at 14 (PR-221, CR-193).

[12] *See* Galvasid's March 20, 2025, Submission at Appendix S3C-1 (CR-544).

[13] *See* Galvasid's January 13, 2025, Section C Response at 27-28 (PR-221, CR-193).

> The cost of transportation for shipments ... has been reported in
> "INTNFRU" field in the sales listing provided in Appendix C-1.[14]

Moreover, Galvasid's Section C response explained that Galvasid had not obtained outside

insurance for its U.S. sales, but instead self-insured U.S. sales made on a CIF basis by

compensating the customer for any losses during transit directly from its own funds. As

Galvasid's response explained:

> Galvasid's sales of CORE products to Puerto Rico during the
> investigation period were made on a CIF basis. Although the terms of
> sale made Galvasid responsible for losses during marine transport,
> Galvasid did not obtain marine insurance for these sales. Instead, in the
> event that the merchandise was damaged or lost during transport,
> Galvasid provided compensation to the customer directly.[15]

Galvasid's initial Section C response also provided a reconciliation of the total sales

value of the U.S. sales reported in its sales listing to the total net sales revenue reported in

its audited financial statements. That sales reconciliation identified the specific accounts in

which Galvasid recorded sales revenues for domestic and export sales in its normal

accounting system.[16] The following table lists the accounts that were identified in the sales

reconciliation as having positive sales revenues.

---

[14] *Id.*

[15] *Id.* at 31.

[16] *See id.* at Appendix C-3. (PR-221, CR-193).

Accounts Identified in Sales Reconciliation
as Accounts in which Galvasid Recorded Sales Revenues[17]

| Account Number | Account Name (Spanish) | Account Name (English Translation) |
|---|---|---|
| 40010001 | Ventas Nacionales | National Sales |
| 40010002 | Ventas Nacionales Compañias Afiliadas | National Sales Affiliated Companies |
| 40030001 | Ventas de Exportación otros Países | Export sales (other countries) |
| 40300001 | Carga y Descarga Mercancias | Loading and Unloading Goods |

The accounts in which Galvasid recorded other items that *reduced* net sales revenues (*i.e.,* discounts and returns) were also specifically identified in the sales reconciliation.[18]

Commerce issued its preliminary affirmative determination on April 10, 2025.  The preliminary dumping margin assigned to Galvasid was calculated based solely on the information submitted by Galvasid, without any application of any facts available.[19]

Commerce conducted on-site verification of Galvasid's questionnaire responses in May of 2025.  At the on-site verification in May of 2025, Galvasid provided Commerce with the commercial invoices issued to Galvasid's U.S. customer for seven individual U.S. sales and seven individual home-market sales.[20]  In each U.S. sale, the invoices stated a single price for each item, and did not separately identify any amounts for freight or

---

[17] *See id; see also* Galvasid's December 23, 2024, Section A Response at Appendix A-8-B (PR-138, CR-38).

[18] *See* Galvasid's January 13, 2025, Section C Response at Appendix C-3 (PR-221, CR-193).

[19]*See Certain Corrosion-Resistant Steel Products from Mexico: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 90 Fed. Reg. 15349 (April 10, 2025), and accompanying Preliminary Decision Memorandum (PR-345, 362).

[20] *See* Galvasid's May 22, 2025, Submission at Appendices 9-E to 9-H and 9-L to 9-N (PR-406, CR-745-748).  *See also id.* at Appendices 9-A to 9-D and 9-I to 9-K (PR-406, CR-744-748).

insurance to be charged to the U.S. customers.[21]  By contrast, the exhibits reviewed by Commerce confirmed that the invoices for some *home-market* sales *did* separately identify amounts for freight or insurance to be charged to home-market customers, which Galvasid separately reported for the relevant home-market sales.[22]

The documents presented at verification also confirmed that the U.S. prices reported in Galvasid's sales listings corresponded to the prices stated on a DDP or CIF basis on Galvasid's invoices to its U.S. customers.[23]  Furthermore, the payment information for U.S. sales that was reviewed at verification demonstrated that the amounts received by Galvasid were exactly equal to the invoice prices and did not include any additional amounts for freight or insurance.[24]

Accounting vouchers presented at verification indicated that, for internal accounting purposes, the sales revenues for individual U.S. sales were recorded, in part, in account 4003001, with the remainder recorded in account 4030001.[25]  As mentioned, both of those accounts had been identified in the U.S. sales reconciliation provided in Galvasid's initial Section C response as accounts in which sales revenues were recorded.[26]  The sales reconciliation indicated that account 4003001 was used to record "Export Sales," while

---

[21] *See id.* at Appendices 9-E to 9-H and 9-L to 9-N (PR-406, CR-745-748)

[22] *See id*.

[23] *See id* at Appendices 9-A to 9-D and 9-I to 9-K (PR-406, CR-744-748).

[24] *See id.*

[25] *See id.*

[26] *See* above at 10.

account 4030001 was used to record revenues for "Loading and Unloading Goods."[27]  The
amounts recorded in account 40300001 reflected Galvasid's internal assignment of a
portion of the total DDP and CIF amounts to freight and insurance.

There was no indication in any of the documents examined by Commerce at
verification that Galvasid's customers had access to the internal breakdown in Galvasid's
normal accounting records or that Galvasid had informed its U.S. customer of *any*
breakdown of the agreed-upon DDP or CIF prices between a price for the merchandise and
separate revenue for freight or insurance.[28]

Commerce issued its report on its verification of Galvasid's sales information on
July 11, 2025.  The sales verification report stated that:

> In our review of the U.S. sales reconciliation and selected sales traces,
> we found that Galvasid included *freight revenue and insurance
> revenue,* which *were separately listed on the sale invoices for
> Galvasid's U.S. sales*, in Galvasid's calculation of U.S. gross unit
> price.[29]

However, the assertion in the verification report that "freight revenue and insurance
revenue... were separately listed on the sale *invoices* for Galvasid's U.S. sales" was
incorrect.[30]  The invoices for U.S. sales that were examined at verification only listed the

---

[27] *See id; see also* Galvasid's December 23, 2024, Section A response at Appendix A-8-B
(PR-138, CR-38).

[28] *See* Galvasid's May 22, 2025, Submission at Appendices 9-E to 9-H and 9-L to 9-N
(PR-406, CR-745-748).

[29] Commerce's July 11, 2025, Memorandum, *Verification of the Sales Response of
Galvasid S.A. de C.V. (Galvasid) in the Antidumping Investigation of Certain
Corrosion-Resistant Steel Products from Mexico* at 2 (PR-421, CR-829).

[30] *See* Final I&D Memo at 48 (PR-466).

prices for U.S. sales on a DDP or CIF basis, without providing any separate listing or other breakdown of "freight revenue" or "insurance revenue."[31]

Interested parties submitted their case and rebuttal briefs in July and August of 2025. In their July 28 Case Brief, Petitioners argued that "Galvasid improperly included freight revenue and insurance revenue in its U.S. gross unit prices, inflating U.S. prices and decreasing its dumping margin," and suggested that Commerce should make an adjustment based on "facts available" to Galvasid's reported U.S. gross unit prices.[32]  Petitioners also argued that Galvasid's reporting of gross unit price was inconsistent between the U.S market and home-market.[33]  At the same time, Petitioners' Case Brief cited and discussed the details of the verification exhibits — which demonstrated conclusively that Petitioners' claims were false.[34]

Galvasid responded to Petitioners' arguments in a Rebuttal Brief submitted on August 4.  In that brief, Galvasid explained that its U.S. sales were made on a DDP or CIF basis; that it had reported that its U.S. sales were made on that basis in its initial questionnaire response; and that, as a matter of law, sales on a DDP or CIF basis make the seller responsible for freight for, and for the risk of loss during transit to the designated delivery location.[35]  Galvasid's Rebuttal Brief also specifically identified the verification exhibits that demonstrated that the invoices and other documents shared with its U.S.

---

[31] *See* Galvasid's May 22, 2025, Submission at Appendices 9-E to 9-H and 9-L to 9-N (PR-406, CR-745-748).

[32] *See* Petitioners' July 28, 2025, Case Brief at 2, 19-20 (PR-446, CR-851).

[33] *See id.* at 17-18.

[34] *See id.*

[35] *See* Galvasid's August 4, 2025, Rebuttal Brief at 16-17 (PR-458, CR-855).

customers did not provide any breakdown of the DDP and CIF prices, and that the only

breakdown of those prices was in the purely-internal accounting vouchers recorded in the

sales in Galvasid's normal accounting records.[36]  And, finally, Galvasid's Rebuttal Brief

identified the *separate* verification exhibits showing that, for some *home-market* sales, the

invoices sent by Galvasid to its customers did separately identify amounts for the

merchandise and for additional freight and insurance charges.[37]  Those amounts (and only

those amounts) had been reported as freight or insurance revenue in Galvasid's

home-market sales listing.

Commerce issued its final affirmative determination on August 29, 2025.  In its final

determination, Commerce calculated a 24.05 percent weighted-average dumping margin

for Galvasid — an increase of almost 10 percentage points from the preliminary

determination.[38]  This increase was due almost entirely to Commerce's decision to apply

partial adverse facts available ("AFA") to reduce Galvasid's reported U.S. gross unit prices

by an estimated amount "to account for the freight and insurance revenue included in

Galvasid's reported gross unit prices.[39]  Notably, Commerce's final determination

acknowledged that the "verification report inadvertently stated, incorrectly, that freight

revenue was separately listed on the U.S. sales invoices."[40]  Nevertheless, Commerce's

final determination concluded that:

---

[36] *See id.* at 17-18 and Attachment 1.

[37] *See id.* at 21 and Attachment 2.

[38] *See* Commerce's August 25, 2025, *Final Determination Margin Calculation Memorandum for Galvasid S.A. de C.V.* at 7 (PR-475, CR-866).

[39] *See* Final I&D Memo at cmt. 12 (PR-466).

[40] *Id.*

> Galvasid failed to disclose in its questionnaire responses that it had
> included freight revenue and insurance revenue in its reported U.S.
> gross unit prices, or that it received these revenues in the U.S. market
> at all.[41]

The final determination did not explain why Commerce believed that Galvasid's prices included separate "freight revenue" and 'insurance revenue," when the documents reviewed at verification demonstrated conclusively: (1) that the reported U.S. prices matched the DDP and CIF prices stated on Galvasid's invoices for U.S. sales, (2) that those invoices did not provide any further breakdown of the DDP and CIF prices, and (3) that the amounts paid by the customers matched the invoice prices and did not include any additional payments to compensate Galvasid for freight or insurance.[42]

Galvasid filed a letter on September 2, 2025, asking that Commerce correct its erroneous application of partial AFA to Galvasid's U.S. gross unit prices in the final determination.  In its letter, Galvasid explained (once more) that there was no separate or additional freight revenue or insurance revenue on its U.S. sales.[43]  Furthermore, Galvasid's letter also explained that Commerce's decision had overlooked the following facts:

> (1)  Galvasid had reported in its Section C response that its U.S. sales were made on
> either a DDP or CIF basis;

---

[41] *Id.*

[42] *See id; see also* Galvasid's May 22, 2025, Submission at Appendices 9-E to 9-H and 9-L to 9-N (PR-406, CR-745-748).

[43] *See* Galvasid's September 2, 2025, Letter at 6-7 (PR-483, CR-869).

(2)  As a matter of law, the DDP and CIF sales terms made Galvasid responsible for
     freight for, and the risk of loss during transit of the merchandise to the location
     designated by the customer; and

(3)  The *expenses* incurred by Galvasid for freight to transport the merchandise to the
     U.S. customers had been separately reported in Galvasid's U.S. sales listing.[44]

On September 8, 2025, Petitioners filed a response to Galvasid's September 2 letter.
In their September 8 letter, Petitioners defended Commerce's application of partial AFA to
Galvasid's U.S. gross unit prices and again claimed, falsely, that Galvasid had not reported
its revenues in the form or manner requested by Commerce.[45]

On September 11, 2025, Galvasid filed a letter requesting, *inter alia*, that Commerce
commence an inquiry pursuant to Section 351.313 of its regulations into the conduct of
Petitioners' counsel.  In that letter, Galvasid explained that Petitioners' arguments
regarding Galvasid's U.S. sales revenue in their July 28 case brief and September 8 letter
were false, constituted improper conduct (as that term has been defined by Commerce),
and warranted sanctions under Section 351.313 of Commerce's regulations.[46]

On September 16, 2025, Commerce issued a memorandum rejecting Galvasid's
September 11 letter as an untimely "surrebuttal" and stating that Galvasid's letter would be

---

[44] *See id.* at 2-5.

[45] *See* Petitioners' September 8, 2025, Letter at 4 (PR-486).

[46] *See* Galvasid's September 11, 2025, Letter at 2-5 (PR-488).

removed from the record.  Commerce did not address Galvasid's request that Commerce

commence an inquiry into the conduct of Petitioners' counsel.[47]

On September 26, 2025, Commerce issued its response to Galvasid's September 2

letter requesting a correction of the final determination.  Commerce's September 26 letter

did not state that the correction requested by Galvasid was outside the scope of

Commerce's authority to correct its determinations.[48]  Instead, Commerce took the position

that its final determination had correctly found that Galvasid had failed to report requested

information.[49]  In this regard, Commerce asserted that the fact that Galvasid had reported

that its U.S. sales were made on a DDP or CIF basis was not, by itself, sufficient to explain

that Galvasid had "incurred" freight and insurance revenue.[50]  Instead, according to

Commerce's memorandum,

> The record remains unclear regarding when and how Galvasid charged
> for freight and insurance revenue, and how Galvasid was accounting
> for such revenue in both its accounting system and its invoice prices.[51]

Tellingly, Commerce once more failed to identify any evidence whatsoever indicating that

Galvasid had separately "charged for freight and insurance revenue," or that Galvasid's

U.S. customers had paid one penny more than the DDP or CIF price stated on the invoice.

---

[47] *See* Commerce's September 16, 2025, Memorandum, *Rejection of Galvasid's September 11, 2025, Request to Reject the Petitioners' Rebuttal Comments and Providing Galvasid an Opportunity to Submit Rebuttal Comments* (PR-490-491)

[48] *See* Commerce's September 26, 2025, Memorandum, *Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from Mexico:  Analysis of Ministerial Error Allegations for the Final Determination* (PR-492).

[49] *See id.* at 5-8.

[50] *See id.* at 6-7.

[51] *Id.*

Nor did it identify any evidence that Galvasid and its U.S. customers had negotiated any separate amounts for freight or insurance.

As a separate matter, Commerce's September 26 letter also noted that Galvasid's U.S. sales listing had failed to report any insurance expenses for the U.S. sales that were reported to have been made on a CIF basis. According to Commerce, the absence of such expenses raised questions about the reporting of the sales terms for Galvasid's U.S. sales:

> Regarding insurance revenue, while Galvasid reported a freight expense for all of its U.S. sales with CIF sales terms, it did not separately report an insurance expense for these sales in its U.S. sales database. Thus, a review of the record demonstrates that Galvasid's sales terms do not match its reporting, even for expenses.[52]

In reality, however, this alleged discrepancy had been fully explained by Galvasid in its initial Section C response, which had explicitly stated that Galvasid did not obtain outside insurance for its U.S. sales, but instead compensated the customer for any losses during transit directly from its own funds.[53]

On January 23, 2026, Galvasid commenced this action by filing a Summons and Complaint challenging Commerce's determination that Galvasid received, but did not report, additional revenue for freight and insurance for its U.S. sales, and Commerce's consequent application of partial AFA to Galvasid's reported gross unit prices to account for the allegedly unreported revenues.[54]

---

[52] *Id.* at 6.

[53] *See* above at 9-10. *See also* Galvasid's January 13, 2025, Section C Response at 31 (PR-221, CR-193).

[54] In addition, Galvasid's Complaint contended that Commerce's rejection of Galvasid's September 11 letter, and its failure to initiate proceedings to assess whether action should be taken against Petitioners' counsel pursuant to Section 351.313 of its regulations, was unlawful and an abuse of discretion. After further consideration, we do not believe that the Court would have jurisdiction over an appeal challenging Commerce's rejection of our

*(footnote continued on following page)*

<u>A</u>RGUMENT

A.  *Commerce's Assertion that Galvasid Had Failed to Report*
    *Additional Freight or Insurance Revenue in the Manner*
    *Requested Is False, and Wholly without Support in the Record*

    1.  *Record Evidence Confirms that Galvasid Had No Additional*
        *Revenue for Freight or Insurance on Its U.S. Sales*

        a.  *Because Galvasid's U.S. Sales Were Made on a DDP or*
            *CIF Basis, the Per-Unit Invoice Prices Necessarily Included*
            *Both the Cost of Transport to the Customer and the Value of*
            *Galvasid's Assumption of the Risk of Loss during Transit*

As explained above, Galvasid's response to Section C of the initial questionnaire had

explicitly informed Commerce that Galvasid's U.S. sales were all made either on a DDP or

CIF basis.  Galvasid's response also included a sale-by-sale listing of its U.S. sales that

reported the sales terms for every single U.S. sale as either DDP or CIF.[55]

Galvasid's initial Section C response also explicitly stated that, because its sales were

made on a DDP and CIF basis, it was responsible for transport of the goods to the

customer and for any risk of loss during transit.[56]  In that regard, Galvasid explained that,

because freight was included in the invoice price under the DDP and CIF sales terms, the

related expenses had been reported separately as items to be deducted from the reported

_____

*(footnote continued from previous page)*
request for proceedings under Section 351.313.  Instead, we believe that any challenge to
Commerce's decision on that issue would have to be brought under the Court's residual
jurisdiction under 28 U.S.C. 1581(i).  We therefore do not intend to pursue our claims on
that issue in the present appeal.

[55] *See* above at 8-10.

[56] *See* above at 9-10.

gross unit price.[57]  However, because Galvasid "self-insured" its U.S. shipments, there was

no separate insurance cost to be reported.[58]

"DDP" and "CIF" are defined International Commerce Terms ("INCOTERMs") that

assign *to the seller* the costs of freight for, and risk of loss during, shipment of the goods to

a designated destination.  For sales made on a DDP (or "Delivered Duty Paid") basis, the

seller is responsible for all costs associated with delivery of the goods to the location

designated by the customer (including any import duties), and the risk of loss transfers to

the buyer when the goods are delivered.[59]  For sales made on a CIF (or "Cost, Insurance,

and Freight") basis, the seller is responsible for the costs associated with delivery of the

goods to the port designated by the customer, and the risk of loss transfers to the buyer

when the goods reach the destination port.[60]  Consequently, the prices for DDP and CIF

sales necessarily include freight and insurance.[61]

---

[57] *See* above at 9-10.

[58] *See* above at 9-10.

[59] *See, e.g., United States v. Katana Racing, Inc.,* 569 F. Supp. 3d 1296, 1301, n.4 (Ct. Int'l Trade 2023) ("According to Incoterms, 'Delivered Duty Paid' means that the seller delivers the goods when the goods are placed at the disposal of the buyer, cleared for import on the arriving means of transport ready for unloading at the named place of destination. The seller bears all the costs and risks involved in bringing the goods to the place of destination and has an obligation to clear the goods not only for export but also for import, to pay any duty for both export and import and to carry out all customs formalities."); *Welded Stainless Pressure Pipe From India: Amended Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 48442 (July 27, 2023), and accompanying Issues and Decision Memorandum at 7 (recognizing that the price included ocean freight "{b}ecause sales were made on a DDP basis.").

[60] *See, e.g., Biodiesel from the Republic of Argentina: Final Affirmative Countervailing Duty Determination,* 82 Fed. Reg. 53477 (Nov. 16, 2017), and accompanying Issues and Decision Memorandum, Nov. 6, 2017, at cmt. 4 ("The CIF terms indicate that the price includes international freight and insurance."); *Certain Steel Concrete Reinforcing Bars from Turkey; Final Results, Rescission of Antidumping Duty Administrative Review in Part, and Determination To Revoke in Part,* 70 Fed. Reg. 67665 (Nov. 8, 2005), and

*(footnote continued on following page)*

Numerous past decisions by Commerce have found sales made on a DDP or CIF basis do not include separately-reportable freight or insurance revenue.  For example, in *Polyester Textured Yarn from Thailand*, Commerce disagreed with Petitioners' argument that the respondent should have reported freight and insurance "revenues" in separate fields in its sales databases.[62]  In reaching its decision, Commerce stated:

> We find that the petitioners' argument that Sunflag failed to report freight revenues is based on an inaccurate characterization of the record relating to the shipping terms on Sunflag's invoices…
>
> For CIF and DDP sales, the price that Sunflag charges to its customers includes freight and insurance in accordance with CIF and DDP terms of sale.  For the sale that the petitioners referenced in their argument, the unit price which appears in the invoice is the final agreed/negotiated price based on the terms of sale and is inclusive of freight and insurance.[63]

Thus, Commerce rejected Petitioners' argument that the respondent should have reported separate freight and insurance "revenues," because the fact that the respondent's sales were

---

*(footnote continued from previous page)*

accompanying Issues and Decision Memorandum, Nov. 2, 2005, at cmt. 22 ("{T}he terms CFR and CIF denote that 'the seller delivers when the goods pass the ship's rail in the port of shipment. The seller must pay the costs and freight necessary to bring the goods to the named port of destination but the risk of loss of damage to the goods, as well as any additional costs due to events occurring after the time of delivery, are transferred from the seller to the buyer.'"). *See also China National Machinery Import & Export Corp. v. United States*, 264 F. Supp. 2d 1229, 1238, n.14 (Ct. Int'l Trade 2003) (In calculating surrogate values in non-market economy cases, "Commerce may adjust data by adding ocean freight and marine insurance costs ('F & I'), as long as such adjustment is reasonable. 'F.O.B.' or 'Free-On-Board' prices do not include F & I whereas 'C.I.F.' or 'Cost-Insurance-and-Freight' prices do.").

[61] *See* above at 19-20.

[62] *See Polyester Textured Yarn from Thailand: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 58883 (Oct. 25, 2021), and accompanying Issues and Decision Memorandum, Oct. 18, 2021, at cmt. 10.

[63] *Id.*

made on a DDP or CIF basis and there was no indication that freight or insurance revenues were separately negotiated with the customer demonstrated that the respondent did not receive such revenues.[64]  Similarly, in *Common Alloy Aluminum Sheet from India*, Commerce rejected Petitioners' argument that the respondent had incorrectly reported its U.S. price, because the sales terms clearly indicated that the invoice price charged to the respondent's U.S. customers "builds in" freight and duty expenses, and because there was no evidence suggesting that the respondent separately negotiated and charged its customers for such expenses.[65]

In these circumstances, the fact that Galvasid had reported that all of its U.S. sales were made on a DDP or CIF basis necessarily meant that there could be no additional freight or insurance revenue charged to the customers for its sales.  There simply was no basis for assuming that any "additional revenue" might have existed.

---

[64] *See id. See also Certain Preserved Mushrooms From the Netherlands: Final Affirmative Determination of Sales at Less Than Fair Value*, 88 Fed. Reg. 18115 (Mar. 27, 2023), and accompanying Issues and Decision Memorandum, Mar. 20, 2023, at cmt. 13 ("We find that the petitioner's argument that the U.S. price is overstated by separately negotiated freight revenues with respect to Prochamp's cost and freight (CFR) sales inaccurately characterizes the record.  {…}  {T}he record reflects that the freight items on the invoice reflect the shipping terms agreed to with the customer and included in the price of the merchandise, *i.e.,* the price that Prochamp charges to its customers "builds-in" freight expenses incurred by Prochamp pursuant to CFR terms of sale.").

[65] *See Common Alloy Aluminum Sheet from India: Final Results of Antidumping Duty Administrative Review; 2020-2022*, 88 Fed. Reg. 76724 (Nov. 7, 2023), and accompanying Issues and Decision Memorandum, Nov. 1, 2023, at cmt. 1.

b.  *Documents Reviewed by Commerce at Verification*
    *Confirm that the Price Received by Galvasid Was Exactly*
    *Equal to the DDP and CIF Invoice Price and that No*
    *Additional Amounts were Paid by the Customer*

At the on-site verification in May of 2025, Galvasid provided Commerce with the commercial invoices issued to Galvasid's U.S. customer for eight individual U.S. sales.[66] None of those invoices — not one — separately identified amounts for freight or insurance to be charged to the U.S. customers.[67]

Instead, the documents presented at verification confirmed that the U.S. prices reported in Galvasid's sales listings corresponded to the prices stated on a DDP or CIF basis on Galvasid's invoices to its U.S. customers.[68]  Furthermore, the payment information for U.S. sales that was reviewed by Commerce at verification demonstrated that the amounts received by Galvasid were exactly equal to the invoice prices and did not include any additional amounts for freight or insurance.[69]

The accounting vouchers presented at verification did show that, for internal accounting purposes, the sales revenues for individual U.S. sales were allocated between two accounts.[70]  As mentioned, both of those accounts had been identified in the U.S. sales reconciliation provided in Galvasid's initial Section C response as accounts in which sales revenues were recorded.[71]  Significantly, there was no indication that these internal

---

[66] *See* Galvasid's May 22, 2025, Submission at Appendices 9-E to 9-H and 9-L to 9-N (PR-406, CR-745-748).

[67] *See id.*

[68] *See id.*

[69] *See id.*

[70] *See id.*

[71] *See* above at 10.

assignments of portions of the total DDP and CIF amounts for freight and insurance were ever communicated with Galvasid's U.S. customers.

In short, the evidence obtained at verification confirms that Galvasid did not receive *any* additional revenue for freight or insurance. The amounts received by Galvasid for U.S. sales were, *in every single case,* exactly equal to the invoice prices stated on a DDP or CIF basis. There was no evidence of any communications between Galvasid and its customers breaking down these DDP and CIF prices into separate amounts for freight and insurance. Commerce's suggestions to the contrary are wholly unsupported by the record.

> 2. *The Past Decisions by Commerce and the Court Confirm that a Respondent Is Not Required to Disaggregate Its Invoice Prices into Separate Fields Based on a Purely Internal Breakdown of a DDP or CIF Invoice Price*

Commerce has adopted the practice of "capping" any upward adjustment for freight and insurance revenue by the amount of the actual freight or insurance costs incurred.[72] In light of this practice, Commerce requires respondents to separately report any freight or insurance revenue, so that Commerce may "cap" the upward adjustment for that revenue by the actual costs incurred.[73] The issue of when and how such separate freight and insurance revenue must be reported has been the subject of extensive litigation.

---

[72] In our view, that practice cannot be reconciled with the statute, which permits an adjustment for freight and insurance costs only if freight and insurance are included in the price that Commerce uses as the start of its calculations. However, the Courts have rejected our position on that issue. *See, e.g., NEXTEEL v. United States,* 28 F.4th 1226, 1239-40 (Fed. Cir. 2022).

[73] *See, e.g.,* Commerce's November 18, 2024, Initial Questionnaire at B-18 and C-16) (PR-111).

This Court has consistently held that such a "cap" may be applied only where the amounts for the service revenue were separately negotiated with the customer.[74]  The Court has also been absolutely clear that Commerce *may not rely on purely-internal company documents* to determine whether there is separate service-related revenue that might be subject to a cap.[75]  As this Court has stated:

> When substantial evidence does not support a finding that the cost of the services was separately negotiable from the price of the subject merchandise, the agency is without legal authority to reduce export price or CEP except by the amount of the expense in question.[76]

As a result, a respondent must report freight or insurance revenues in separate fields in its sales database *only when* such revenues are separately listed on the commercial invoice or negotiated with the customer.[77]

---

[74] *See Hyundai Heavy Industries Co., Ltd. v. United States*, 393 F. Supp. 3d 1293, 1307 (Ct. Int'l Trade 2019) ("When Commerce finds that a service is separately negotiable, its practice has been to cap the service-related revenue by the associated expense in its margin calculations."); *ABB Inc. v. United States*, 355 F. Supp. 3d 1206, 1220-21 (Ct. Int'l Trade 2018).

[75] *See ABB Inc.*, 355 F. Supp. 3d at 1220-21 ("Here, the inquiry is whether Commerce may rely on internal company communications, rather than documentation or communications shared with the unaffiliated customer, to determine that there is separate service-related revenue to cap.  The court concludes that it may not."); *Hyundai Heavy Industries Co., Ltd.,* 393 F. Supp. 3d at 1307.

[76] *ABB Inc.*, 355 F. Supp. 3d at 1220.

[77] *See id. See also Polyester Textured Yarn from Thailand: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 58883 (Oct. 25, 2021), and accompanying Issues and Decision Memorandum, Oct. 18, 2021, at cmt. 10 (Rejecting Petitioners' argument that the respondent should have reported freight and insurance "revenues" in separate fields in its sales databases because "{f}or CIF and DDP sales, the price that {respondent} charges to its customers includes freight and insurance in accordance with CIF and DDP terms of sale" and "because no freight and insurance revenues were separately negotiated and recovered from the customer."); *Common Alloy Aluminum Sheet from India: Final Results of Antidumping Duty Administrative Review; 2020-2022*, 88 Fed. Reg. 76724 (Nov. 7, 2023), and accompanying Issues and Decision Memorandum, Nov. 1, 2023, at cmt. 1 (Rejecting Petitioners' argument that respondent

*(footnote continued on following page)*

As described above, there is no evidence in this case that freight or insurance revenue amounts for U.S. sales were separately listed on Galvasid's invoices or separately negotiated with its customers. Instead, Galvasid's U.S. sales were run-of-the-mill DDP and CIF transactions in which the negotiated invoice price covered the cost of transport to the designated location and assigned the risk of loss to Galvasid. Under this Court's well-established rulings, there was simply no reason for Galvasid to believe that the purely internal breakdown of its DDP and CIF prices in its accounting records warranted any special reporting.

### B. Commerce's Application of Adverse Facts Available to Adjust Galvasid's U.S. Prices was Unlawful

Pursuant to 19 U.S.C. § 1677e(a), Commerce may only resort to use of facts otherwise available if "*necessary* information is not available on the record," or when a respondent "withholds information that has been *requested*," "fails to provide such information by the deadlines …or in the form or manner *requested*," "significantly impedes a proceeding," or "provides such information but the information cannot be verified."[78] Furthermore, 19 U.S.C. § 1677e(b) provides that Commerce "may" make an adverse inference where an interested party has not acted to the "best of its ability" to comply with Commerce's information requests.[79]

---

*(footnote continued from previous page)*
failed to properly report its U.S. prices because "here is no evidence on this record showing that {respondent} separately negotiated and charged its customer for these expenses; indeed, {respondent} provided a purchase agreement, proforma invoice, and sales invoice for the subject merchandise where there are no line items separately identifying freight, insurance, or duties charges.").

[78] 19 U.S.C. § 1677e(a)(1)-(2) (emphasis added).

[79] 19 U.S.C. § 1677e(b).

In this case, however, the information regarding the alleged "additional revenue" was neither "necessary" nor "requested." In addition, the U.S. price information submitted by Galvasid was fully verified. As a result, Commerce's application of adverse facts available was unlawful.

1.    *Commerce Never Requested Information on the Purely Internal Breakdown of Galvasid's U.S. Sales Prices*

This Court has made clear that Commerce may not apply adverse facts available when a respondent fails to submit information that was never requested. As this Court has explained, "Commerce {has} its own obligation to ensure that {respondent} was fully aware of what information the Department sought and the form in which it sought the data."[80] In other words, "Commerce must clearly and definitively ask for what it wants."[81] And an "alleged response deficiency cannot support application of {best information available} where the information sought was apparently never requested."[82]

As described above, Commerce's initial questionnaire instructed Galvasid to report freight and insurance revenue in separate fields only if "the invoice to your customer includes separate charges for other services directly related to the sale, such as a charge for shipping." As described above, the evidence is clear that the invoices for Galvasid's U.S. sales did not include any such separate charges.

Commerce's final determination, nevertheless, attempted to justify its application of adverse facts available by asserting that it "identified an instance where Galvasid issued a

---

[80] *SKF USA v. United States*, 391 F. Supp. 2d 1327, 1336 (Ct. Int'l Trade 2005).

[81] *Saha Thai Steel Pipe v. United States*, 605 F. Supp. 3d 1348, 1363 (Ct. Int'l Trade 2022).

[82] *Queen's Flowers de Colombia v. United States*, 981 F. Supp. 617, 628–29 (Ct. Int'l Trade 1997).

- 28 -

separate invoice" to the customer for insurance.[83]  However, as explained to Commerce in Galvasid's September 2 submission, an examination of the documents included in the sales trace for that transaction confirms that no invoice was issued from Galvasid to its U.S. customer for insurance.[84]  Instead, there was a *credit* from Galvasid to the customer *reducing* the amount owed to Galvasid, and a corresponding invoice from Galvasid to an insurance provider named [                                    ] for compensation for the loss on the transaction.[85]

Furthermore, there is nothing in the record that suggests that Commerce instructed Galvasid to report whether there was an internal breakdown of its DDP and CIF U.S. sales prices.  Commerce's application of adverse facts available based on Galvasid's failure to predict that Commerce would want that information — despite the clear instructions to the contrary in Commerce's questionnaire — is unlawful and fundamentally unfair.

### 2. Information on Galvasid's Purely Internal Breakdown of Its DDP and CIF U.S. Sales Prices Was Not "Necessary"

As discussed above, information on separately-invoiced freight and insurance revenue is "necessary" to permit Commerce to apply its "capping" methodology.  However, the Court's and Commerce's own past decisions have been clear that the "capping" methodology can only be applied when the freight and insurance revenue amounts are separately stated on the seller's invoice to the customer or separately negotiated between

---

[83] Final I&D Memo at 48 and note 197. (PR-466).

[84] *See* Galvasid's May 22, 2025, Submission at Appendix 9-M (PR-406, CR-747).

[85] *See id.* at 15-18.  The payment from the insurer (in Mexican pesos) was the same as the credit given to the customer (when converted to Mexican pesos).

the seller and the customer.[86]  In these circumstances, it was not "necessary" for Galvasid

to submit information on how the company internally breaks down invoice amounts for

accounting purposes.

In short, the evidence on the record confirms that there is no "gap" in the record with

respect to Galvasid's reporting of its U.S. gross unit prices, that Galvasid timely complied

with all of Commerce's requests for information to the best of its ability, and that the

information that Commerce claims is "missing" from this case was not necessary.  Thus,

Commerce's application of adverse facts available was unsupported by the evidence and

contrary to law.[87]

### CONCLUSION

As demonstrated above, Commerce's findings that Galvasid received "additional

revenue" and withheld necessary information have no support in the record.  Commerce's

application of adverse facts available to Galvasid is contrary to the statute and this Court's

well-established precedents.  This Court should, therefore, remand this case with

instructions to Commerce to recalculate the dumping margins for Galvasid without any

application of adverse facts available.  Given the simplicity of the issue and the correction,

---

[86] *See* above at 23-24.

[87] *See, e.g., Clearon Corp. v. United States*, 359 F. Supp. 3d 1344, 1356-58 (Ct. Int'l Trade 2019) (holding Commerce's use of AFA was unreasonable because there was no *necessary* information missing from the record, because the record evidence clearly demonstrated that the respondent did not use or benefit from the program in question).

no more than 15 days should be permitted for that remand, to ensure that the remedy

provided to Galvasid is swift and meaningful.

Respectfully submitted,

/s/Jeffrey M. Winton
Jeffrey M. Winton
Amrietha Nellan
Vi N. Mai
Rachel Hauser

WINTON & CHAPMAN PLLC
1100 13th Street NW, Suite 825
Washington, DC  20005
(202) 774-5500

Attorneys for Galvasid S.A. de C.V.

Dated:  January 30, 2026