**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE**

| | |
|---|---|
| GALVASID S.A. DE C.V., )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>STEEL DYNAMICS, INC.; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, and UNITED STATES STEEL CORPORATION, )<br><br>Defendant-Intervenors. ) | **PUBLIC VERSION**<br>Court No. 26-00825<br>BPI Information On<br>Pages 6-8, 17-20, 27-29 |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S**
**<u>RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD</u>**

BRETT SCHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

OF COUNSEL:
K. Garrett Kays
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
Enforcement and Compliance

Brendan D. Jordan
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice

March 27, 2026

*Attorneys for Defendant*

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ...................................................................................2

    I.     Administrative Determination Under Review .............................................................2

    II.    Issue Presented for Review .........................................................................................2

STATEMENT OF FACTS .............................................................................................................2

    I.     Initial Request for Information and Responses............................................................3

    II.    Findings at Verification ...............................................................................................5

    III.   Arguments Before Commerce .....................................................................................7

    IV.   Final Determination .....................................................................................................9

    V.    Ministerial Error Determination ...............................................................................11

SUMMARY OF ARGUMENT.....................................................................................................13

ARGUMENT ...............................................................................................................................14

    I.     Standard of Review....................................................................................................14

    II.    Commerce's Application of Partial Adverse Facts Available to Galvasid's
          Reporting of Freight and Insurance Revenue Is Supported by Substantial
          Evidence and Is In Accordance with Law................................................................15

          A.  Substantial Evidence Supports Commerce's Decision To Use Facts Available
              To Adjust Galvasid's Gross U.S. Price For Unreported Freight And Insurance
              Revenues .........................................................................................................15

          B.  Commerce's Reliance on Adverse Facts Available To Adjust Galvasid's
              Gross U.S. Price For Unreported Freight And Insurance Revenues Was
              Supported By Substantial Evidence And In Accordance With Law .................26

CONCLUSION.............................................................................................................................29

**Cases**                                                                                                      **Page(s)**

*ABB Inc. v. United States,*
   355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018) ................................................................. 23, 24

*Am. Alloys, Inc. v. United States,*
   30 F.3d 1469 (Fed. Cir. 1994) ........................................................................................ 19

*Cleo Inc. v. United States,*
   501 F.3d 1291 (Fed. Cir. 2007) ..................................................................................... 15

*Consol. Edison Co. of N.Y. v. NLRB,*
   305 U.S. 197 (1938) ....................................................................................................... 14

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966) ....................................................................................................... 14

*Downhole Pipe & Equip., L.P. v. United States,*
   776 F.3d 1369 (Fed. Cir. 2015) ..................................................................................... 29

*Fujitsu Gen. Ltd. v. United States,*
   88 F.3d 1034 (Fed. Cir. 1996) ....................................................................................... 14

*Goodluck India Ltd. v. United States,*
   11 F.4th 1335 (Fed. Cir. 2021) ...................................................................................... 19

*Hung Vuong Corp. v. United States,*
   483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020) ................................................................. 25

*Hyundai Elec. & Energy Sys. Co. v. United States,*
   15 F.4th 1078 (Fed. Cir. 2021) ................................................................................. 19, 20

*Hyundai Elec. & Energy Sys. Co. v. United States,*
   578 F. Supp. 3d 1245 (Ct. Int'l Trade 2022) ................................................................. 24

*Hyundai Heavy Indus. Co., Ltd. v. United States,*
   393 F. Supp. 3d 1293 (Ct. Int'l Trade 2019) ................................................................. 25

*Micron Tech., Inc. v. United States,*
   117 F.3d 1386 (Fed. Cir. 1997) ................................................................................. 19, 20

*Ningbo Dafa Chem. Fiber Co. v. United States,*
   580 F.3d 1247 (Fed. Cir. 2009) ..................................................................................... 14

*Nippon Steel Corp. v. United States*,
   337 F. 3d 1373 (Fed. Cir. 2003) ...................................................................... *passim*

*PAM, S.p.A v. United States*,
   582 F.3d 1336 (Fed. Cir. 2009) ............................................................................ 26

*QVD Food Co. v. United States*,
   658 F.3d 1318 (Fed. Cir. 2011) ............................................................................ 25

*Torrington Co. v. United States*,
   68 F.3d 1347 (Fed. Cir. 1995) .............................................................................. 19

*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009) ............................................................................................. 14

**Statutes**

19 U.S.C. § 1516a(b) ................................................................................................ 14

19 U.S.C. § 1673d(e) ................................................................................................ 12

19 U.S.C. § 1677e ..................................................................................................... 26

19 U.S.C. § 1677e(a) .................................................................................... 10, 15, 20

19 U.S.C. § 1677e(b) ......................................................................................... 10, 27

19 U.S.C. § 1677m(d) ............................................................................................... 25

19 U.S.C § 1677m(i) ................................................................................................... 5

**Regulations**

19 C.F.R. § 351.224 .................................................................................................. 12

19 C.F.R. § 351.224(f) .............................................................................................. 12

19 C.F.R. § 351.308 .................................................................................................. 15

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE**

| | |
|---|---|
| GALVASID S.A. DE C.V., | ) |
| Plaintiff, | ) |
| v. | ) **PUBLIC VERSION** |
| | ) Court No. 26-00825 |
| | ) BPI Information On |
| UNITED STATES, | ) Pages 6-8, 17-20, 27-29 |
| Defendant, | ) |
| and | ) |
| STEEL DYNAMICS, INC.; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, and UNITED STATES STEEL CORPORATION, | ) |
| Defendant-Intervenors. | ) |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S**
**RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Defendant, the United States, respectfully submits this response to the motion for

judgment upon the agency record filed by plaintiff, Galvasid S.A. de C.V. (Galvasid). Galvasid

Br., ECF Nos. 10, 11. Galvasid challenges the Department of Commerce's affirmative final

determination in the less-than-fair-value investigation of Certain Corrosion-Resistant Steel

Products (CORE) from Mexico. As demonstrated below, Commerce's determination is

supported by substantial evidence and is otherwise in accordance with law. Accordingly, we

respectfully request that the Court deny Galvasid's motion, sustain Commerce's determination,

and enter judgment for the United States.

**STATEMENT PURSUANT TO RULE 56.2**

## I.    Administrative Determination Under Review

The administrative determination under review is *Certain Corrosion-Resistant Steel Products From Mexico: Final Affirmative Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 42,187 (Aug. 29, 2025) (final affirm. determination of sales at less than fair value) (P.R. 482) (*Final Determination*), amended in *Corrosion-Resistant Steel Products From Brazil and Mexico* 90 Fed. Reg. 59,494 (Dep't of Commerce Dec. 19, 2025) (amended final determination and AD order) (P.R. 508), and the accompanying Issues and Decision Memorandum (IDM) (P.R. 466). The period of investigation is July 1, 2023, to June 30, 2024. *Id.*

## II.    Issue Presented for Review

1.    Whether Commerce's application of partial adverse facts available to Galvasid's reporting of freight and insurance revenue is supported by substantial evidence and is in accordance with law.

**STATEMENT OF FACTS**

On September 25, 2024, Commerce initiated an antidumping duty (AD) investigation into whether imports of CORE from various countries, including Mexico, are being or are likely to be, sold in the United States at less than fair value. *See Certain Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 89 Fed. Reg. 80,196 (Dep't of Commerce Oct. 2, 2024) (P.R. 60). On October 21, 2024, Commerce limited the number of respondents selected for individual examination to the two exporters and producers that accounted for the largest volume of entries of the subject merchandise into the United States during the period of investigation:

Galvasid S.A. de C.V. (Galvasid) and Ternium Mexico.  Respondent Selection Memorandum (Oct. 21, 2024) (P.R. 80/C.R.28).

### I.      Initial Request for Information and Responses

On November 18, 2024, Commerce issued the initial AD Questionnaire to Galvasid.  AD Questionnaire (Nov. 18, 2024) (P.R. 111).  The AD Questionnaire requested that Galvasid report the revenues it receives in separate data fields in its sales database. *See generally id.* at 84-103. The AD Questionnaire begins with the notion that "gross unit price less price adjustments should equal the net amount of revenue received from the sale." *Id.* at 82.  Commerce's questionnaire requested that Galvasid report information such that "{i}f the invoice to your customer includes separate charges for other services directly related to the sale, such as a charge for shipping, create a separate field for reporting each additional charge." *Id.*  Section C of the AD Questionnaire requested information about the United States market, including a sales list and other data necessary to calculate the price in or to the United States market.  Specifically, Section C included this request:

> The fields listed above {for expenses in the Section C AD questionnaire} have been designed to capture all revenues and expenses you have incurred in selling the subject merchandise in the United States market. *If there are additional revenues or expenses that are not reported above, such as export taxes incurred in the country of manufacture, create a field for each in the computer file, describe the revenue or expense in your narrative response, and include all calculation worksheets as attachments to your narrative response.*

*Id.* at 9, 103 (emphasis added).

In response, Galvasid reported its U.S. sales on a Delivered Duty Paid (DDP) or Cost, Insurance, and Freight (CIF) basis.  Galvasid's Section C Questionnaire Response (Jan. 13, 2025) (C.R. 193), (Galvasid CQR) at 14, 17-18, 27-28, and 30-34; Galvasid's Supplemental

Section D Questionnaire (March 20, 2025) (Galvasid SSDQR) at Exhibit S3C-1 (C.R. 537, 544), (Galvasid's sales database US03).

Section B of the AD Questionnaire requested information about a respondent's home market, or where appropriate, a third country market, including a sales list and other information necessary for Commerce to calculate the normal value of the merchandise. AD Questionnaire at 8. Galvasid stated in its response that it "charged certain home market customers for freight and/or insurance, as separate items on the invoice" and that it accordingly reported freight revenue and insurance revenue for home market sales in separate fields, respectively "FRTREVH" and "INSUREVH." *Id.* (citing Galvasid Section B Questionnaire Response (January 13, 2025) (C.R. 192) at 28). Galvasid did not report any similar revenue sources for its reporting of U.S. sales. *See* Galvasid CQR at 27-51. Galvasid did not create any other fields for other sources of revenues. IDM at 48.

On February 6, 2025, Commerce issued a supplemental questionnaire. Commerce's Sections B-C Supplemental Questionnaire (February 6, 2025) (P.R. 259/C.R. 299). The supplemental questionnaire asked Galvasid to reconcile the total sales quantity reported in its U.S. sales database to its accounting system. *Id.* at 5. In response, Galvasid provided a reconciliation of the total sales quantity reported in its U.S. sales listing to Galvasid's accounting system as provided in Appendix SC-4, which included a single gross unit price. Galvasid Section B and C Supplemental Questionnaire Response (February 24, 2025) (P.R. 278-279/C.R. 303-304).

Next, Commerce issued a subsequent supplemental questionnaire, inquiring further into detail about the U.S. sales reconciliation. Specifically, Commerce repeated its request for supporting documentation and narrative description for each step of its U.S. sales reconciliations.

4

Commerce's Second Section B-C Supplemental Questionnaire (February 21, 2025) (P.R. 276/C.R. 301) at 3.  In response, Galvasid provided a step-by-step narrative description of such sales reconciliation with documentation.  Galvasid Response Commerce Second Sections B-C Supplemental Questionnaire (March 3, 2025) (P.R. 297/C.R. 424) at 3-4, Appendix S2C-1 (P.R. 298/C.R. 426).

In its preliminary determination, Commerce calculated an estimated weighted-average dumping margin for Galvasid of 14.43 percent.  *Certain Corrosion-Resistant Steel Products From Mexico*, 90 Fed. Reg. 15,349 (Dep't of Commerce April 10, 2025) (prelim affirmative determ. LTFV, postponement of final determ., extension of provisional measures) (P.R. 362), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 345).  Galvasid's calculated rate at the preliminary determination did not include any adjustments based on facts available or facts available with an adverse inference.

## II.      **Findings at Verification**

Consistent with 19 U.S.C § 1677m(i), Commerce verified Galvasid's questionnaire responses.  Galvasid's Sales Verification Report (July 11, 2025) (C.R. 829).  Prior to the on-site verification, Commerce provided Galvasid an agenda outlining its verification procedures.  Galvasid Sales Verification Agenda (May 2, 2025) (C.R. 679/P.R. 378).  There, Commerce explained that, for certain pre-selected sales, it would "trace" the sale from initial inquiry/order through Galvasid's records to receipt of payment from the customer.  Commerce also explained that "{a}dditional sales to be examined may be identified during verification."  *Id.* at 9, 17.  Specifically, Commerce stated:

> For the sales trace of each selected sale, a complete set of documents should be prepared for that sale supporting all sale-specific information listed in the U.S. or comparison sales files you reported to Commerce.  For charges and adjustments that represent the transaction-specific charges and adjustments for that transaction, such as on-invoice

discounts, freight, commissions etc., the supporting documents should be included in the prepared set of support documents for that transaction and, where appropriate, a worksheet should be provided to link the charge or adjustment reported for that observation. The verifier will check each column (e.g., product characteristics, date of sale and invoice, gross price, quantity, shipping date, payment date, commissions, etc.) of the sales files against the documents. Also, include in your sales-trace package, for each sale, copies of records that link the sale to the sales journal used in the reconciliation of overall quantity and value of sales. Charges and adjustments that have been reported on an allocated (non-sale-specific) basis will be verified separately as stand-alone topics.

*Id.* at 9. To conduct the "sales trace," Commerce requested the applicable invoice and other specific items of documentary evidence for each sale. *Id.* at 9-10.

In its review of the U.S. sales reconciliation and selected sales traces, Commerce found, for the first time at verification, that Galvasid had included both freight revenue and insurance revenue in its reported U.S. gross unit price (GRSUPRU).[1] Galvasid's Sales Verification Report at 14. Commerce also found that the sales accounts included within Galvasid's total sales values in its U.S. sales reconciliation were inclusive of freight revenue and insurance revenue. *See* Galvasid's Sales Verification Report at 11[2], 14. In its "Completeness Test" for Galvasid's

---

[1] In its Galvasid Sales Verification Report, Commerce stated that freight and insurance revenue "were separately listed on the sale invoices for Galvasid's U.S. sales, in Galvasid's calculation of U.S. gross unit price." Galvasid Sales Verification Report at 2. Commerce later explained that this finding was an error. IDM at 48 ("While we agree with Galvasid that our verification report inadvertently stated, incorrectly, that freight revenue was separately listed on the U.S. sales invoices for these transactions, and that the separation of freight revenue was instead included in the total invoice value and separately listed in the associated accounting vouchers presented in the sales traces, Commerce was nevertheless unaware of the fact that Galvasid was receiving these revenues.").

[2] These accounts can be found in Galvasid's response to Commerce's first section B-C Supplemental Questionnaire Response at Appendix SC-4 (C.R. 304). For example, in Galvasid Sales Verification Exhibit SVE-7b, which is a SAP accounting system screenshot of its own sales voucher for Galvasid's sales reconciliation at page 15-2, Galvasid reported values of [          ] and [          ] as going to the [                    ] account and the [          ] amount being charged to the ultimate customer in the invoice at 15-1. Galvasid Verification Exhibit, Part 7 (C.R. 741) at 31-32. Galvasid's own internal accounting system designates revenues from [                    ]

breakdown of freight and insurance revenue, Commerce found that, while these values were excluded from Galvasid's home market sales database, they were included within the gross unit price, GRSUPRU, of Galvasid's US sales database. *Id.* at 13. Commerce also found that when conducting sales traces, freight revenue was included in the calculated gross unit price for sequential numbers (SEQUs) [███████████████████████████] and insurance revenue was included in the calculated gross unit price for SEQU [███]. *Id.* at 2.[3]

### III.  **Arguments Before Commerce**

In their administrative case brief, the domestic petitioners[4] argued that Galvasid overstated U.S. prices that improperly include freight revenue and insurance revenue. Petitioner's Galvasid Sales Case Brief (July 28, 2025) (C.R. 851) at 16-23. The petitioners specifically referenced Commerce's findings in seven sales traces, which included either freight revenue and/or insurance revenue. *Id.* at 17 (citing Galvasid's Sales Verification Report at 14 and Galvasid's Sales Verification Exhibits, Part 12 and 13 (Exhibits 9-E through 9-H and 9-L through 9-N). The petitioners further argued that, because all sales traces examined during verification included freight revenue, Commerce should conclude that all sales reported in

--------

[████████]. *See* Appendix SC-4. Commerce found the difference in accounts, that is, one zero [████████████████], was meaningful to its findings of unreported revenues.

[3] Commerce requested that respondents assign a unique sequential number to each sales record, which is referred to as a SEQU. *See* AD Questionnaire at C-6. Commerce explained that this sales record number should remain constant in all future submissions such that sales record line items should not be renumbered during the course of this segment. Commerce stated that this consistency in reporting will assist respondents in reconciling calculations with the data submitted in responses. *See* AD Questionnaire at 72.

[4] The petitioners include Steel Dynamics, Inc., United States Steel Corporation, Wheeling-Nippon Steel, Inc., and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC.

Galvasid's U.S. sales database include freight revenue in the reported gross unit price. Petitioner's Galvasid Sales Case Brief at 18.

Additionally, the petitioners asserted that an unknown number of U.S. sales included insurance revenue in the reported gross unit price. The petitioners explained that the amount of insurance revenue associated with SEQU [████████████████████], which made it impossible to determine with certainty how much insurance revenue was incorporated into the U.S. gross unit price. *Id.* The petitioners also referenced Galvasid's response to Section B of the Questionnaire that it "charged certain home market customers for freight and/or insurance, as separate items on the invoice" and that it accordingly reported freight revenue and insurance revenue for home market sales in separate fields, "FRTREVH" and "INSUREVH." *Id.* (citing Galvasid Section B Questionnaire Response (January 13, 2025) (C.R. 192) at 28. The petitioners referenced Commerce's findings at verification that freight and insurance revenues were "included as {} separate line item{s} in the sales invoice." *Id.* (citing Galvasid Sales Verification Report at 14). The petitioners argued that Galvasid included these items in the gross unit price for U.S. sales, which Commerce found at the first time at verification, which led to an inflated U.S. price and decrease in Galvasid's dumping margin. *Id.* at 18. The petitioners further argued that Commerce was unable to cap the freight revenues and insurance revenues relative to their related expenses because these unreported freight and insurance revenues were first discovered at verification. *Id.* at 18-19. The petitioners concluded that Galvasid's overstatement of its U.S. gross unit prices required such prices to be reduced using facts otherwise available with an adverse inference (AFA) by decreasing all of Galvasid's U.S. gross unit sales prices. *Id.* at 20-21.

In response, Galvasid argued that its U.S. sales during the period of investigation were made on a delivered basis, which included the cost of freight and related expenses incurred to transport the merchandise from Galvasid's plant to the location designated by the customer and these costs are reflected in the invoices by the delivered price. Galvasid Rebuttal Sales Brief (August 4, 2025) (C.R. 855) (citing Galvasid CQR at 14 and Galvasid SSDQR at Exhibit S3C-2). Further, Galvasid asserted that the invoice amounts for each sale were disaggregated and recorded in three separate accounts and that there is no evidence that Galvasid's internal accounting entries were ever communicated to, let alone negotiated with, its U.S. customers. Galvasid Rebuttal Sales Brief at 18. Galvasid stated that a "cap" may be applied only where the amounts for service revenue were separately negotiated with the customer. *Id.* at 18-19. Galvasid asserted that the record demonstrated that the unit price negotiated with its customers and that ultimately appeared on Galvasid's U.S. invoices was a delivered price that included any transport services that Galvasid was required to provide under the agreed-upon terms of sale. *Id.* at 20. Galvasid also explained that its reporting of the U.S. gross unit price did not "diverge{}" from its home-market sales reporting", as the petitioners suggested. Galvasid explained that it did not separately report freight and/or insurance revenue amounts for any sales — to U.S. or home-market customers — for which the invoices and other sales documents provided to the customer did not separately identify amounts for those services. *Id.* at 21. Finally, Galvasid disagreed that an adverse inference was warranted, contending that it timely responded to all questionnaires with accurate data and full sets of documents generated in the normal course of business, such that there are no gaps in the record that would require Commerce to resort to facts otherwise available for Galvasid's U.S. gross unit prices. *Id.* at 22.

IV.     **Final Determination**

In the final determination, Commerce determined that Galvasid failed to disclose in its questionnaire responses that freight revenue and insurance revenue was included in its reported U.S. gross unit prices, or that it received these revenues in the U.S. market at all. IDM at 48 (citing Galvasid CQR at 21). Commerce explained that it did not discover until verification that Galvasid included additional accounts containing freight and insurance revenue within its sales reconciliation, that Galvasid received such revenue, and had included the revenue in its reported U.S. prices. IDM at 48 (citing Galvasid Sales Verification Report at 14). Specifically, of the seven pre-selected U.S. sales transactions examined at verification, all seven sales included previously unexplained freight revenue and one sale included similarly unexplained insurance revenue. IDM at 48 (citing Galvasid Sales Verification Report at 13.). Commerce requested Galvasid report additional sources of revenue, but Galvasid did not provide separate revenue data fields in its U.S. sales database or disclose the existence of such revenues in the U.S. market. Accordingly, Commerce explained that it could not determine whether the reporting of such expenses within the gross unit price was appropriate prior to verification, much less identify the amount of freight revenue and insurance revenue attributed to each individual gross unit price or which sales Galvasid also received freight and/or insurance revenue in its U.S. sales database. IDM at 48; *see also* AD Questionnaire at 82, 103.

Thus, Commerce determined that necessary information related to Galvasid's freight and insurance revenues was missing from the record, was not provided in a timely manner or in the form or manner requested, significantly impeded the proceeding, and could not be verified, pursuant to 19 U.S.C. §§ 1677e(a)(1) and (a)(2)(B)-(D). *See* IDM at 49. Therefore, in accordance with 19 U.S.C. § 1677e(b)(1)(A), Commerce determined that Galvasid failed to cooperate by not acting to the best of its ability to comply with Commerce's requests for

information and did not put forth maximum effort to provide Commerce with full and complete answers to all inquiries, consistent with *Nippon Steel Corp. v. United States*, 337 F. 3d 1373, 1382-83 (Fed. Cir. 2003). *See* IDM at 49. Using "partial adverse facts available," Commerce applied an estimated amount by which Galvasid's reporting method overstated U.S. price and decreased all of Galvasid's reported U.S. gross unit prices by that estimated amount to account for the freight and insurance revenue included in Galvasid's reported gross unit prices. *Id.*; *see also* Galvasid Final Calculation Memorandum (August 27, 2025) (P.R. 475, C.R. 863). Commerce further explained that it found this estimated amount to be appropriate because it is based on Galvasid's data and Commerce's findings after examining the data. IDM at 49. Based on this, and other findings, Commerce calculated a weighted-average dumping margin of 24.05 percent for Galvasid. *Final Determination*, 90 Fed. Reg. at 42,188.

V.     **Ministerial Error Determination**

On September 2, 2025, Galvasid submitted a ministerial error allegation where it alleged that Commerce's application of AFA was based on a factual error that ignored record evidence. Galvasid Ministerial Error Allegation (September 2, 2025) (C.R. 869). Specifically, Galvasid argued that its U.S. sales were made either on a DDP or CIF basis, which included freight and insurance to transport the merchandise from Galvasid's plant to the location designated by the customer. *Id.* at 2 (citing Galvasid CQR at 14, 17-18; 27-28 and 30-33). Additionally, Galvasid argued that its Section C response explained that because freight and insurance were included in the invoice price under these sales terms, the related expenses were being reported as reductions to the reported gross unit price. *Id.* at 3 (citing Galvasid CQR e at 27-28, 33-34). Additionally, Galvasid argued that it was not required to separately report the amount of freight and insurance included in the invoice price as "revenue" for its U.S. sales. *Id.* at 6 (citing AD Questionnaire at

11

B-18 and C-16). Thus, Galvasid argued that it correctly reported the gross unit price based on the invoice price without separately reporting an amount for freight or insurance "revenue" for its U.S. sales, such that Commerce is not permitted to "cap" the amount of freight and insurance included in the U.S. invoice price. *Id.* at 7.

Galvasid also argued that Commerce's analysis double-counted the freight and insurance costs by making an AFA adjustment for any revenue and then a separate adjustment for the actual costs incurred. *Id.* at 8-9. The petitioners argued that Galvasid's Ministerial Error Allegation sought to relitigate a methodological decision made by Commerce in the final determination, which did not meet the standard for a ministerial error set forth in 19 U.S.C. § 1673d(e) and 19 C.F.R. § 351.224. Petitioners' Response to Galvasid Ministerial Error Comments (September 8, 2025) (P.R. 486).

Commerce found that Galvasid's allegation did not constitute a ministerial error pursuant to 19 C.F.R. § 351.224(f) and was an intentional methodological decision explained within the final determination. Ministerial Error Allegation Memorandum (September 29, 2025) (P.R. 492,C.R. 871) at 5, 8. Commerce explained that while DDP denotes freight incurred by the seller and the CIF sales term denotes both insurance and freight incurred by the seller, these sales terms represent expenses incurred by the seller and do not explain how, if any, revenue is incurred and how it is accounted. *Id.* at 6. In response to Galvasid's discussion of its sales terms

when reporting DINLFTPU[5] and INTNFRU[6] and how it disclosed that Galvasid incurred freight revenue, Commerce explained that these are expenses and did not explain how, if any, freight revenue is incurred. *Id.* Furthermore, regarding insurance revenue, Commerce clarified that while Galvasid reported a freight expense for all of its U.S. sales with CIF sales terms, it did not separately report an insurance expense for these sales in its U.S. sales database. *Id.*

Commerce did find a ministerial error with respect to its application of the financial expense ratio because Commerce did not incorporate a minor correction with respect to this ratio that was accepted at verification as the correct financial expense ratio applicable to Galvasid. *Id.* at 3. Thus, Commerce amended its final determination to correct this error, which increased Galvasid's margin from 24.05 percent to 24.09 percent and the all-others rate from 17.40 percent to 17.42 percent. *Id.* at 3; *see also* Ministerial Error Comments (September 2, 2025) (C.R. 870); *see also Corrosion-Resistant Steel Products From Brazil and Mexico,* 90 Fed. Reg. 59,494, 59,496 (Dep't of Commerce Dec. 19, 2025) (amended final determ. and AD Orders).

<u>**SUMMARY OF ARGUMENT**</u>

In the course of the investigation to derive a weighted average dumping margin for Galvasid, Commerce rationally relied on partial adverse facts available to adjust certain information Galvasid has reported in its sales data. Commerce did so because the information Galvasid provided during the verification process contradicted data that Galvasid previously

---

[5] DINLFTPU is shorthand for "Inland Freight - Plant/Warehouse to Port of Exportation." Specifically, Commerce asked respondents to report the unit cost of inland freight to the port of exportation in the country of manufacture from the factory or distribution warehouse (or other intermediate location). Where multiple items were included in a shipment, Commerce requested that freight cost should be allocated on the basis incurred (*e.g.*, weight, volume). *See* AD Questionnaire at 88.

[6] INTNFRU is shorthand for "International Freight." Commerce requested that respondents report the unit cost of ocean freight or air freight incurred on shipments from the port of exit in the country of manufacture to the U.S. port of entry. *See* AD Questionnaire at 90.

reported and therefore could not be verified, and because Galvasid had failed to act to the best of its ability in responding to Commerce's questionnaires. Galvasid contests the application of adverse facts available, but its arguments are not supported by the record evidence. All Commerce did was adjust Galvasid's data to better align with Galvasid's own back-up documents. Because Commerce's findings, under the statute to apply partial adverse facts available, are supported by substantial evidence, this Court should sustain Commerce's determination.

## ARGUMENT

### I. Standard of Review

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion' found by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

Commerce's factual findings "are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 & n.6 (2009) (citation omitted)). "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938); *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1253 (Fed. Cir. 2009). Even if the Court may draw two inconsistent conclusions from the evidence contained in the record, doing so "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted). An agency decision may not be overturned "simply because the reviewing court would

14

have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501

F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted).

**II.     Commerce's Application of Partial Adverse Facts Available to Galvasid's Reporting of Freight and Insurance Revenue Is Supported by Substantial Evidence and Is In Accordance with Law**

Commerce is permitted to use "facts otherwise available" in reaching its determinations if

it determines that (1) "necessary information is not available on the record," (2) "an interested

party or any other person . . . withholds information that has been requested by {Commerce}, (3)

fails to provide such information by the deadlines . . . or in the form and manner requested," (4)

"significantly impedes a proceeding" or (5) the interested party "provides such information but

the information cannot be verified." 19 U.S.C. § 1677e(a); *see also* 19 C.F.R. § 351.308

(providing for "{d}eterminations on the basis of the facts available"). The purpose of "facts

otherwise available" is to "fill in . . . gaps" in the administrative record. *Nippon Steel*, 337 F.3d

at 1381.

Here, Commerce used "facts otherwise available" with an adverse inference to reflect an

appropriate amount by which Galvasid's reporting method overstated U.S. prices. Commerce's

use of "facts otherwise available" also reflected a reduction that corresponds to Galvasid's

reported U.S. gross unit prices to account for the freight and insurance revenue included in

Galvasid's reported gross unit prices. IDM at 49. Commerce's use of "facts otherwise

available" was reasonable given that it was based on Galvasid's data and Commerce's findings

after examining the data. As we explain below, this decision should be sustained because it is

supported by substantial evidence and in accordance with law.

**A.  Substantial Evidence Supports Commerce's Decision To Use Facts Available To Adjust Galvasid's Gross U.S. Price For Unreported Freight And Insurance Revenues**

Section C of Commerce's Initial AD Questionnaire asks for information about a respondent's sales of the subject merchandise in or to the United States. AD Questionnaire at 67. Commerce uses this information to compare the prices at which this merchandise is sold in the United States with the prices at which the foreign like product is sold in the foreign market to determine whether the subject merchandise was sold at less than normal value in the United States during the period of investigation. *Id.* The gross unit price is the starting point of this comparison, before any adjustments are made. *Id.* As part of its questionnaire process, Commerce asked Galvasid to report "additional revenues" so that Commerce could "capture all revenues and expenses {a respondent has} incurred in selling the subject merchandise in the United States market." IDM at 47 (citing AD Questionnaire at 103). Additionally, the AD questionnaire states that "{i}f the invoice to your customer includes separate charges for other services directly related to the sale, such as a charge for shipping, create a separate field for reporting each additional charge." AD Questionnaire at 82. In response to Commerce's request, Galvasid responded by providing sales databases for its U.S. sales of subject merchandise. Galvasid SSDQR at Exhibit S3C-1, (Galvasid's sales database US03).

Within this database, Galvasid reported the amount of any additional amounts charged by Galvasid to the customer for freight and insurance for its *home market* sales, on a per-metric-ton basis, in the "FRTREVH" and "INSUREVH" fields. Galvasid Section B Questionnaire Response at 28 (citing Appendix B-1). However, no such fields were created for freight or insurance revenue for Galvasid's sales bound for the United States. *See* IDM at 48; *see also* Galvasid CQR at 27-51.

Commerce then attempted to vet these reported numbers. Commerce asked Galvasid to verify its sales transactions by preparing a variety of requested sourcing documents. *See*

16

Galvasid Sales Verification Agenda at 9-10. Because Commerce could not reasonably scrutinize every one of Galvasid's reported sales, Commerce instead specified seven transactions through which it planned to verify Galvasid's reported data. *Id.* at 9, 16-17. Commerce explained that, for these sales, it would "trace" the selected sale from initial inquiry/order through the respondent's records to receipt of payment from the customer. *Id.* at 9. Commerce also explained that "{a}dditional sales to be examined may be identified during verification," which would be later classified as "surprise sales traces." *Id.*; Galvasid Sales Verification Report at 14.

However, problems arose when Galvasid provided its verification responses. Commerce's review of each sales trace indicated that freight and insurance revenue was included as a separate line item in Galvasid' sales documentation. IDM at 49, *see also* Galvasid Verification Report at 14. Specifically, for *every* U.S. sales trace reviewed, SEQUs [███████] [████████████████], freight revenue was included as a separate line item in the sales documentation. *Id.* (emphasis added).

The table below shows how freight revenue was included in the sales traces reviewed:

| Sales Trace | Commerce's Findings | | |
|---|---|---|---|
| SEQU [    ] | Commerce observed that [      ▉      ] of the [    ▉    ] was classified as [     ▉     ] in its [    ▉    ].[7] |
| SEQU [    ] | Commerce observed that [      ▉      ] of the [    ▉    ] was classified as [     ▉     ] in its [    ▉    ].[8] |

---

[7] Galvasid Verification Exhibit, Part 11 (May 23, 2025) (C.R. 745) at 99; *see also* Galvasid Commercial Invoice for sales trace [██], which denotes a final charge of [██████] as the final charge to the customer. *Id.* at 92.

[8] Galvasid Verification Exhibit, Part 12 (May 23, 2025) (C.R. 746) at 27; *see also* Galvasid Commercial Invoice for sales trace [██], which denotes a final charge of [██████] as the final charge to the customer. *Id.* at 19.

| | | |
|---|---|---|
| SEQU [ ▮ ] | Commerce observed that [ ▮ ] of the [ ▮ ] was classified as [ ▮ ] in its [ ▮ ].[9] | |
| SEQU [ ▮ ] | Commerce observed that [ ▮ ] of the [ ▮ ] was classified as [ ▮ ] in its [ ▮ ].[10] | |
| SEQU [ ▮ ] | Commerce observed that [ ▮ ] of the [ ▮ ] was separated similar to other freight revenue values above.[11] | |
| SEQU [ ▮ ] | Commerce observed that [ ▮ ] of the [ ▮ ] was classified as [ ▮ ] in its [ ▮ ].[12] | |
| SEQU [ ▮ ] | Commerce observed that [ ▮ ] of the [ ▮ ] was separated similar to other freight revenue values above in the [ ▮ ].[13] | |

Although Galvasid's surprise sales trace for SEQU [ ▮ ] evidenced freight revenue, it also evidenced insurance revenue as a separate line item. *Id.* Indeed, similar to the freight revenues discussed above, Galvasid's [ ▮ ] included a charge of [ ▮ ] and denoted it as [ ▮ ]. Galvasid Verification Exhibit, Part 13 at 116. Similarly, Commerce found that the documentation denoted that it was for a [ ▮ ] and [ ▮ ] for a value of [ ▮ ], *id.* at 117, and that a bank statement evidenced the [ ▮ ] for the same amount. *Id.* at 118.

---

[9] Galvasid Verification Exhibit, Part 12 at 60; *see also* Galvasid Commercial Invoice for sales trace [ ▮ ], which denotes a final charge of [ ▮ ] as the final charge to the customer. *Id.* at 52.

[10] Galvasid Verification Exhibit, Part 12 at 90; *see also* Galvasid Commercial Invoice for sales trace [ ▮ ], which denotes that [ ▮ ] was the final charge to the customer. *Id.* at 83.

[11] Galvasid Verification Exhibit, Part 13 (May 23, 2025) (C.R. 747) at 84; *see also* Galvasid Commerce Invoice for sales trace [ ▮ ], which denotes [ ▮ ] as the final charge to the customer. *Id.* at 76.

[12] Galvasid Verification Exhibit, Part 13 at 113; *see also* Galvasid Commercial Invoice for sales trace [ ▮ ], which denotes [ ▮ ] as the final charge. *Id.* at 106.

[13] Galvasid Verification Exhibit, Part 13 at 143; *see also* Galvasid Commercial Invoice for sales trace [ ▮ ], which denotes [ ▮ ] as the final charge to the customer. *Id.* at 136.

Additionally, Galvasid's 2023 financial statement included [█] different accounts within its sales ledger of its financial statements. Galvasid Sales Verification Report at 11, 13; *see also* Galvasid Section B and C Supplemental Questionnaire Response at Appendix SC-4. To confirm that the items in these accounts were appropriately included or excluded using adjustments in the sales reconciliation, Commerce requested company officials provide a monthly breakdown of the included accounts [███████████████████████████████████████████████ ████████]. *Id.* Commerce found that the values in these accounts reported in the trial balance summary for the sales reconciliation tied to the sales reconciliation. *Id.* But most importantly, Commerce found that, while the values for freight and insurance revenue were excluded from Galvasid's home market sales database, they were included within the gross unit price, GRSUPRU, of Galvasid's U.S. sales database. *Id.* at 11 and 13.

These facts all support Commerce's application of "facts available." These facts further undermine Galvasid's argument that Commerce's determination is without support in the record. Galvasid's additional arguments regarding the adequacy of its responses also fail.

As courts have recognized, to make the verification process effective, Commerce has broad discretion and latitude in how it chooses to conduct its verification procedures. *See, e.g.*, *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1394-95 (Fed. Cir. 1997); *Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995); *Am. Alloys, Inc. v. United States*, 30 F.3d 1469, 1475 (Fed. Cir. 1994). And verification procedures are designed for verifying the accuracy and completeness of submitted factual information, not to provide for the submission of "new factual information." *See Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1337 (Fed. Cir. 2021); *Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078, 1089 (Fed. Cir.

19

2021); *see also Micron Tech.*, 117 F.3d at 1396 (verification procedures that provide for a "spot check" of financial figures are reasonable).

Here, Commerce asked Galvasid to verify its sales transactions with documentary evidence so that Commerce could analyze the information included in sale traces, specifically requesting documentary information related to the gross unit price for each comparison market sale. Galvasid Verification Agenda at 9-10. Galvasid, for each requested sale, provided invoices and [      ] and [      ] documents to support its actual reported gross unit price. IDM at 48; *see also* Verification Report at 14, Galvasid Verification Exhibit, Part 13 at 92 and 99, 52 and 60, 83 and 90, 76 and 84, 106 and 113, 136 and 143; Galvasid Verification Exhibit, Part 12 at 19 and 27. And Commerce found, for the first time during verification, that the gross unit price included in the invoices contained certain values for freight and insurance revenue. IDM at 48; *see also* Verification Report at 14. At bottom, Galvasid's *own* reported data could not be reconciled with documentary evidence requested for the purpose of verification, IDM at 47-49, and that justified Commerce's use of "facts available." 19 U.S.C. § 1677e(a)(2)(D) (explaining that Commerce may use facts available when information provided by an entity cannot be verified).

Galvasid argues that its responses to section C of the AD Questionnaire adequately addressed Commerce's concern about the unreported freight and insurance revenues, because its sales are reported on a DDP and CIF basis, which assign costs of freight to the seller. Galvasid Br. at 20-22. However, this argument misses the point and fails to explain why Galvasid's own internal records show unreported freight and insurance revenues if such sales were reported on a DDP and CIF basis that assigns costs to the seller (and were subsequently reported in the DINLFTPU and INTNFRU fields). This omission is important because Commerce has a

20

practice, not disputed by Galvasid, of excluding freight and insurance revenue from the calculation of gross unit price, and instead capping these revenues by the expense amount when appropriate. IDM at 47 (citing *Certain Orange Juice from Brazil*, 77 Fed. Reg. 63,291 (Dep't of Commerce October 16, 2012) (final results and no shipment determ.), and accompanying IDM at Comment 6. Because Galvasid did not report the separately enumerated freight and insurance revenues in its initial U.S. sales database, or otherwise disclose the existence of such revenues in its U.S. sales, Commerce could not determine whether the inclusion of such expenses within the gross unit price was appropriate prior to verification. Nor could Commerce identify the amount of freight revenue and insurance revenue attributed to each individual gross unit price or which sales Galvasid also received freight and/or insurance revenue in its U.S. sales database. IDM at 49. Therefore, Galvasid's argument about the inclusion of certain costs in the reporting of DPP and CIF incoterms, alone, does not address the inclusion of previously unreported revenues first discovered at verification and were included in Galvasid's gross unit price, and does not enable Commerce to cap these revenues by the expense amount, consistent with its practice.

Galvasid also cites other proceedings, where, it argues, Commerce found sales made on a DDP or CIF basis do not include separately reportable freight or insurance revenue. Galvasid Br. at 22-23. However, Commerce's treatment of freight and insurance revenues, in these proceedings, is inapposite. The issue here is not whether the inclusion of these revenues in the gross unit price was inappropriate; instead, the issue is whether Galvasid provided Commerce with the requested information in the first instance. Other cases, where Commerce found that sales made on a DDP or CIF basis do not include certain revenues, are not relevant as Galvasid did not report such figures in its U.S. sales databases. *See* Galvasid CQR at 14, 17-18, 27-28, and 30-34; Galvasid SSDQR at Exhibit S3C-1.

Galvasid's reference to Commerce's antidumping duty investigation into imports of polyester textured yarn from Thailand is inapposite. *See* Galvasid Br. at 21-22 (citing *Polyester Textured Yarn from Thailand*, 86 Fed. Reg. 58,883 (Dep't of Commerce Oct. 25, 2021) (final affirm. LTFV determ.), and accompanying IDM at 25-26. In *Polyester Textured Yarn from Thailand*, the respondent explained "that the accounting system demonstrates that freight and insurance revenues were not reported under a separate column because no freight and insurance revenues were separately negotiated and recovered from the customer." *Id.*, IDM at 25. On the contrary, here, each sales trace indicated that these revenues were recovered from the customer. Galvasid's Verification Report at 14.

Galvasid also references Commerce's administrative review of the antidumping duty order covering common alloy aluminum sheet from India as an instance where the agency found that the respondent had not incorrectly reported its U.S. price because the sales terms clearly indicated that the invoice price charged to the respondent's U.S. customers "builds in" freight and duty expenses, and because there was no evidence suggesting that the respondent separately negotiated and charged its customers for such expenses. Galvasid Br. at 23 (citing *Common Alloy Aluminum Sheet from India*, 88 Fed. Reg. 76,724 (Dep't of Commerce Nov. 7, 2023) (final results), and accompanying IDM at 6-7. Commerce, however, explained that in *Common Alloy Aluminum Sheet from India*, "there {was} no evidence on {the} record showing that {the respondent} separately negotiated and charged its customer for these expenses; indeed, {the respondent} provided a purchase agreement, proforma invoice, and sales invoice for the subject merchandise where there are no line items separately identifying freight, insurance, or duties charges." *Id.*, IDM at 7. Additionally, Commerce explained that the "{t}he freight and insurance values that appear in the bottom corner of the invoice, distinct from the line items with

the quantity and value of the merchandise, are for Customs declaration purposes only." *Common Alloy Aluminum Sheet from India* IDM at 6. Thus, contrary to the facts in *Common Alloy Aluminum Sheet from India*, Commerce found unreported freight and revenue by looking at Galvasid's *own internal records*.

Galvasid's argument that Commerce's analysis of the invoices and accounting vouchers confirmed that the U.S. prices reported in Galvasid's sales listings corresponded to the prices stated on a DDP or CIF basis on Galvasid's invoices to its U.S. customers is also misplaced. Galvasid Br. at 24-25. Commerce found at verification that Galvasid included unreported freight and insurance revenue in its sales documentation and included in its reported gross united price. Galvasid Sales Verification Report at 14. Regardless of whether the invoice amount and the reported gross unit price are the same, Commerce explained that it found discrepancies in the underlying evidentiary documents, verifying a gap in the record to the extent that Galvasid failed to report all of its revenues and expenses, as directed in the initial AD questionnaire. IDM at 49.

Galvasid's attempt to minimize Commerce's analysis of the accounting vouchers is equally unavailing. *See* Galvasid Br. at 24. The mere fact that the accounting vouchers assign sales revenue to two accounts, for internal accounting purposes, does not change the fact that Commerce discovered that Galvasid had included both freight revenue and insurance revenue in its reported U.S. gross unit price. Galvasid Sales Verification Report at 14, IDM at 48. However Galvasid organizes the revenues received, for its own accounting purposes, does not rebut evidence of the collection of such freight and insurance revenues.

Galvasid's references to *ABB Inc. v. United States* for the proposition that Commerce may not rely on purely internal company documents to determine whether there is separate service-related revenue that might be subject to a cap is misplaced. *See* 355 F. Supp. 3d 1206,

1220-21 (Ct. Int'l Trade 2018). Although Commerce in *ABB Inc.* made a similar finding that the respondent overstated its U.S. price because the documents reviewed at verification included revenues that exceed their expenses, *ABB Inc.* is distinguishable. *Id.* at 1215. In *ABB Inc.*, the Court held that Commerce's finding that the respondent failed to properly report service-related revenues included in multiple invoices to U.S. customers containing separate line items for services that the respondent did not separately report, was supported by substantial evidence. *Id.* at 1218; *see also id.*, n.19 ("Specifically, the invoices {evaluated at verification} provided for three of the five transactions received by Commerce separately identified service-related charges."). And in *ABB Inc.*, Commerce relied on internal company communications to determine that there was separate service-related revenue to cap. *Id.* at 1220. However, Commerce's reliance on internal company communications for its capping methodology is not the issue in this case – the issue here is whether Galvasid should have disclosed that it received freight and insurance revenue in the first instance. And because Commerce did not receive the underlying information, it could not make the determination of the appropriateness of requiring a freight or insurance revenue cap. IDM at 48. By failing to report such later-discovered revenues in its initial sales database, Galvasid deprived Commerce of the opportunity to determine the appropriateness of its practice, prior to verification. *Id.*

Indeed, this Court has previously distinguished *ABB*, and its discussion of "internal… communications." *Hyundai Elec. & Energy Sys. Co. v. United States*, 578 F. Supp. 3d 1245, 1254 (Ct. Int'l Trade 2022). The Court in *Hyundai Elec. & Energy Sys. Co.* held that the evidence of service-related revenues in internal communications, at issue in *ABB*, was a "factual predicate" of Commerce's treatment of service-related revenues when there is evidence of affiliation between the exporter and the customer. *Id.* (citing *ABB*, 355 F. Supp. 3d at 1219).

Thus, because there was no evidence of affiliation in *Hyundai Elec. & Energy Sys. Co.*, this Court rejected the plaintiff's reliance on *ABB*'s discussion of internal communications and found that the respondent had failed to report its service-related revenue. *Hyundai Elec. & Energy Sys. Co.*, 578 F. Supp. 3d at 1254-56 (sustaining Commerce's application of adverse facts available for failure to report service-related revenues prior to verification).[14] As Galvasid has raised no evidence of affiliation, its reliance on *ABB* is similarly misplaced.

*Hyundai Heavy Indus. Co., Ltd. v. United States* can be similarly distinguished. The unreported revenue figures in that case were not first discovered at verification, unlike here. 393 F. Supp. 3d 1293, 1307 (Ct. Int'l Trade 2019). Galvasid argues that Commerce identified no record evidence that indicates that freight or insurance revenue amounts for U.S. sales were separately listed on Galvasid's invoices or separately negotiated with its customers. Galvasid Br. at 27. This argument misses the mark. Here, by failing to disclose in its questionnaire responses that it had included freight revenue and insurance revenue in its reported U.S. gross unit prices, Galvasid prevented Commerce from inquiring further into these unreported revenues. In turn, Commerce could not establish whether its capping practice was appropriate. IDM at 48; *see also QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (". . . the burden of creating an adequate record lies with interested parties . . ."). Thus, based on Galvasid's own

---

[14] To the extent that Galvasid argues that *Hyundai Elec. & Energy Sys. Co.* is factually distinguishable, based on the two deficiency questionnaires issued to the respondent under 19 U.S.C. § 1677m(d), this Court has held the statute's deficiency requirements do not apply when Commerce discovers information, for the first time, at verification. *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1349 (Ct. Int'l Trade 2020) ("Thus, insofar as a respondent's questionnaire answers on their face comply with Commerce's information requests, § 1677m(d) does not apply if Commerce, upon verification, determines that those questionnaire answers are inaccurate. In short, verification is not an opportunity for a do-over; instead, the purpose of verification is to confirm information previously submitted by a respondent in response to Commerce's requests for information.").

internal records, first discovered at verification, Commerce reasonably found a gap in the record warranting application of facts otherwise available, when it discovered that Galvasid had included both freight revenue, for *every* sales trace conducted, and insurance revenue for one sales trace, in its reported U.S. gross unit price. IDM at 47-49, Galvasid Sales Verification Report at 14.

### B. Commerce's Reliance on Adverse Facts Available To Adjust Galvasid's Gross U.S. Price For Unreported Freight And Insurance Revenues Was Supported By Substantial Evidence And In Accordance With Law

As we explained above, Commerce's application of "facts available" allows Commerce to fill gaps in the record when the information it sought is not otherwise available and to apply an adverse inference if Commerce determines that a party has failed to cooperate by not acting to the best of its ability. 19 U.S.C. § 1677e. The AFA statute thus imposes clear requirements on a responding party. It requires a respondent to act to "the best of its ability"—that is, to put forth "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel*, 337 F.3d at 1382. While intentional conduct, such as deliberate concealment or inaccurate reporting surely evinces a failure to cooperate, a finding of intent is not required because "inadequate inquiries" can also suffice. *Id*. at 1383. "While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping." *Id*. At bottom, a party is obligated to conduct a reasonable inquiry to investigate the accuracy of information that it submits to Commerce. *See PAM, S.p.A v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009).

Here, Commerce applied partial AFA to Galvasid's reporting of gross unit price, where it found that Galvasid's reporting method overstated U.S. price and decreased all of Galvasid's reported U.S. gross unit prices by that estimated amount to account for the freight and insurance

revenue included in Galvasid's reported gross unit prices and first discovered at verification. IDM at 49. Specifically, because Commerce could not identify which sales are affected within the U.S. sales data, as adverse facts available, Commerce applied a [███] percent overall reduction to Galvasid's gross unit U.S. price, as this is the average amount by which U.S. prices were increased by the inclusion of freight and insurance revenue. *Id.*; *see also* Galvasid Final Determination Margin Calculation Memorandum (August 25, 2025) (C.R. 866).

Commerce found that Galvasid failed to act to the best of its ability to comply with Commerce's requests for information and did not put forth maximum effort to provide Commerce with full and complete answers to all inquiries, within the meaning of 19 U.S.C. § 1677e(b)(1)(B). *See* IDM at 49; *see also Nippon Steel*, 337 F.3d at 1382. From the start, Commerce requested Galvasid to report revenues that it receives in separate data fields in its sales database. IDM at 47 (citing AD Questionnaire at 103). Specifically, Commerce stated that "{i}f there are additional revenues or expenses that are not reported above…, create a field for each in the computer file, describe the revenue or expense in your narrative response, and include all calculation worksheets as attachments to your narrative response." *Id.* Additionally, Commerce's questionnaire requested that Galvasid reporting information such that "{i}f the invoice to your customer includes separate charges for other services directly related to the sale, such as a charge for shipping, create a separate field for reporting each additional charge." *Id.* at 82. Thus, Commerce's AD Questionnaire instructs respondents to report all revenues incurred in selling the subject merchandise in the U.S., and that any types of revenue not already specifically included within the AD questionnaire should still be disclosed. IDM at 47. Despite clear requests by Commerce to report such revenues, Galvasid reported gross unit prices that consistently did not correspond to underlying documentation on the record. IDM at 47-49;

Galvasid Sales Verification Report at 14; *see also* Galvasid Verification Exhibit, Part 12 and Part 13.

Ultimately, Commerce may reasonably find that a party did not act to the best of its ability, when for the first time, Commerce found documentary evidence at verification, indicating that value amounts explicitly delineated for [██████████████] and [██████████████] from the from the overall gross unit price, were included in Galvasid's sales documentation and contradicted Galvasid's reporting in its U.S. sales database. *Id*. And under the antidumping statute Commerce is obligated to make "a factual assessment of the extent to which a respondent keeps and maintains reasonable records and the degree to which the respondent cooperates in investigating those records and in providing Commerce with the requested information." *See Nippon Steel*, 337 F.3d at 1383.

Galvasid argues that Commerce only instructed Galvasid to report freight and insurance revenue in separate fields only if "the invoice to your customer includes separate charges for other services directly related to the sale, such as a charge for shipping." Galvasid Br. at 28. This does not accurately characterize Commerce's request for other sources of revenue, nor does it square with evidence on the record that indicates that freight and insurance revenue were included in the gross unit price included in the invoices, as evidenced by the supporting documentation. Galvasid Sales Verification Report at 14; *see also* Galvasid Verification Exhibit, Part 12 and Part 13. Therefore, Galvasid's argument that Commerce never requested such information is unsupported by the record.

Galvasid also seeks to undermine Commerce's findings regarding an instance where Galvasid issued a separate invoice for insurance revenue. Galvasid Br. at 28-29; *see also* IDM at 48 (citing Galvasid Verification Exhibit, Part 13 at 116). Galvasid argues that this document is

28

not an invoice, but a "credit from Galvasid to the customer reducing the amount owed to Galvasid, and a corresponding invoice from Galvasid to an insurance provider . . . for compensation for the loss on the transaction." Galvasid Br. at 29. In addition to conceding that this shows that there are amounts "owed to Galvasid," this argument does not undermine Commerce's analysis: the documentation clearly describes the figures as [

]. *See* IDM at 47-49; *see also* Galvasid Verification Report at 2,11, 14 and Verification Exhibit, Part 13 at 117. Galvasid's arguments to the contrary constitute a request of this Court to reweigh evidence, which it cannot do. *See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1379 (Fed. Cir. 2015).

Finally, Galvasid argues that reporting of separately-invoiced freight and insurance revenue is not "necessary" because the relevant evidence indicating that the revenue amounts are separately stated on the seller's invoice to the customer or separately negotiated between the seller and the customer is not present on the record. Galvasid Br. at 29-30. Again, this does not undermine Commerce's findings, as Galvasid's failure to report these revenues, or otherwise describe their presence in the gross unit price, prevented Commerce from further inquiring into the issue to determine if its capping practice would be appropriate. As AFA, and using Galvasid's own reported data, Commerce reasonably applied an overall reduction to "GRSUPRU," as the average amount by which U.S. prices were increased by the inclusion of freight and insurance revenue. IDM at 49.

### CONCLUSION

For these reasons, we respectfully request that the Court deny the plaintiff's motion for judgment upon the administrative record and enter judgment for the United States.

29

Respectfully submitted,

BRETT SCHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

<table>
<tr><td>OF COUNSEL:</td><td><u>/s/ Brendan D. Jordan</u></td></tr>
<tr><td>K. Garrett Kays</td><td>Brendan D. Jordan</td></tr>
<tr><td>Attorney</td><td>Trial Attorney</td></tr>
<tr><td>U.S. Department of Commerce</td><td>Commercial Litigation Branch</td></tr>
<tr><td>Office of the Chief Counsel for Trade</td><td>Civil Division</td></tr>
<tr><td>Enforcement and Compliance</td><td>United States Department of Justice</td></tr>
<tr><td>1401 Constitution Avenue, NW</td><td>P.O. Box 480</td></tr>
<tr><td>Washington, D.C. 20230</td><td>Ben Franklin Station</td></tr>
<tr><td>Tel: (202) 482-0018</td><td>Washington, D.C. 20530</td></tr>
<tr><td>Fax: (202) 482-4912</td><td>Tel: (202) 616-0342</td></tr>
<tr><td>Email: kenneth.kays@trade.gov</td><td>Email: brendan.d.jordan@usdoj.gov</td></tr>
<tr><td>March 27, 2026</td><td>*Attorneys for Defendant*</td></tr>
</table>

**CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2026, I caused the foregoing document to be electronically filed with the Clerk of the Court using CM/ECF. The filing will also be served via email at the following addresses:

James Ransdell
JRansdell@cassidylevy.com

Jeffrey Gerrish
jgerrish@schagrinassociates.com

Jeffrey Winton
jwinton@winton.law