Slip Op. 26-80

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| GALVASID S.A. DE C.V., | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | |
| Defendant, | Before: Jane A. Restani, Judge |
| and | Court Nos. 25-00235 & 26-00825[1] |
| STEEL DYNAMICS, INC.; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC; and UNITED STATES STEEL CORPORATION, | **Public Version** |
| Defendant-Intervenors. | |

## OPINION AND ORDER

Dated: July 24, 2026

[Remanding the Department of Commerce's final determination in the antidumping duty investigation of certain corrosion-resistant steel products from Mexico.]

Jeffrey Michael Winton, Winton & Chapman PLLC, of Washington, DC, argued for the plaintiff Galvasid S.A. de C.V. Also on the brief were Amrietha Nellan, Michael J. Chapman, Rachel Marie Hauser, and Vi Mai.

Julius A. Halstead, Commercial Litigation Branch – Civil Division, U.S. Department of Justice, of Washington, DC, argued for the defendant. Also on the brief was Brendan David Jordan, Lead Attorney, Commercial Litigation Branch – Civil Division, U.S. Department of Justice. Of counsel

---

[1] Throughout this opinion, the court cites to the docket entries on Ct. No. 25-00235 to the extent the filings are materially similar. The court will indicate where it cites to the docket entries in Ct. No. 26-00825.

on the brief were <u>Emily Elaine Burton</u>, U.S. Department of Commerce and <u>Kenneth Garrett Kays</u> and <u>Samuel Edward Childerson</u>, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Jeffrey David Gerrish</u>, Schagrin Associates, of Washington, DC, argued for defendant-intervenors Steel Dynamics, Inc. and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC.  Also on the brief were <u>Alessandra A. Palazzolo</u>, <u>Amanda Grace Swenson</u>, <u>Christopher Todd Cloutier</u>, <u>Elizabeth Jackson Drake</u>, <u>Justin M. Neuman</u>, <u>Luke Anthony Meisner</u>, <u>Maliha Khan</u>, <u>Nicholas Joel Birch</u>, <u>Nicholas Phillips</u>, <u>Roger Brian Schagrin</u>, <u>Saad Younus Chalchal</u>, and <u>William A. Fennell</u>.

<u>James Edward Ransdell, IV</u>, Cassidy Levy Kent (USA) LLP, of Washington DC, for defendant-intervenor United States Steel Corporation.  Also on the brief were <u>Margaret Eline Monday</u> and <u>Thomas Martin Beline</u>.

Restani, Judge:  Before the court is plaintiff Galvasid S.A. de C.V.'s ("Galvasid") challenge to the final determination made by the United States Department of Commerce ("Commerce") in the antidumping duty ("AD") investigation of Certain Corrosion-Resistant Steel Products ("CORE") from Mexico, covering the period of investigation ("POI") from July 1, 2023, to June 30, 2024.  <u>Certain Corrosion-Resistant Steel Products from Mexico: Final Affirmative Determination of Sales at Less Than Fair Value</u>, 90 Fed. Reg. 42,187 (Dep't Commerce Aug. 29, 2025) ("<u>Final Determination</u>").

Galvasid requests that the court hold Commerce's <u>Final Determination</u> unsupported by substantial evidence on the record and otherwise not in accordance with law.  Confidential Mot. of Pl. Galvasid for J. on the Agency R. at 19–29, ECF No. 31 (Jan. 26, 2026) ("Galvasid Mot.").  The United States (the "government") and the defendant-intervenors Steel Dynamics, Inc.; United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC; and United States Steel Corporation (collectively, the "defendant-intervenors") ask the court to sustain Commerce's <u>Final Determination</u>.  <u>See</u> Def.'s Confidential Opp'n to Pl.'s Rule 56.2 Mot. for J. upon the Agency R., ECF No. 37 (Mar. 27, 2026) ("Gov't Resp."); Def.-Intervenors' Resp. in Opp'n to Pl.'s Rule 56.2 Mot. for J. on the Agency R.,

Court Nos. 25-00235 & 26-00825                                                    Page 3

ECF No. 33 (Mar. 27, 2026) ("Def-Int. Resp.").

## BACKGROUND

On October 2, 2024, Commerce initiated an AD investigation into whether imports of CORE from Mexico are being or are likely to be sold in the United States at less than fair value ("LTFV"). Certain Corrosion-Resistant Steel Products from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations, 89 Fed. Reg. 80,196, 80,201 (Dep't Commerce Oct. 2, 2024). On October 21, 2024, Commerce selected Galvasid, a producer and exporter of CORE from Mexico, as one of the two mandatory respondents in this review. Commerce's Respondent Selection Mem. at 5, C.R. 28, P.R. 80 (Oct. 21, 2024); Compl. ¶ 3, ECF No. 6 (Oct. 28, 2025).

Commerce issued its initial AD questionnaire to Galvasid on November 18, 2024, Commerce's Initial Questionnaire at 2, A-201-863, POI 7/1/2023-6/30/2024 (Dep't Commerce Nov. 18, 2024) ("Init. Questions"), and supplemental questionnaires on February 6 and 21, 2025. Commerce's Section B-C Suppl. Questionnaire, C.R. 299, P.R. 259 (Feb. 6, 2025); Commerce's 2d Section B-C Suppl. Questionnaire, C.R. 301, P.R. 276 (Feb. 21, 2025). Galvasid responded to each questionnaire. Galvasid's Section A Resp., C.R. 35, 38, P.R. 137–38 (Dec. 23, 2024); Galvasid's Section B. Resp., C.R. 192, P.R. 220 (Jan. 13, 2025) ("B Resp."); Galvasid's Section C Resp., C.R. 193, P.R. 221 (Jan. 13, 2025) ("C Resp."); Galvasid's Resp. to Sections B-C Suppl. Questionnaire, C.R. 303–04, P.R. 278–79 (Feb. 24, 2025); Galvasid's Resp. to 2d Sections B-C Suppl. Questionnaire, C.R. 424, 426, P.R. 297–98; Galvasid's Suppl. Section D Questionnaire Resp., C.R. 537, 544, P.R. 328 (Mar. 20, 2025).

On April 10, 2025, Commerce issued its preliminary affirmative determination, assigning

a preliminary dumping margin of 14.43% to Galvasid.  Certain Corrosion-Resistant Steel Products from Mexico: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures, 90 Fed. Reg. 15,349, 15,350 (Dep't Commerce Apr. 10, 2025); Decision Mem. for the Prelim. Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from Mexico, A-201-863, POI 7/1/2023-6/30/2024 (Dep't Commerce Apr. 3, 2025).  In May 2025, Commerce conducted an on-site verification of Galvasid's questionnaire responses. See Commerce's Sales Verification Agenda for Galvasid, C.R. 679, P.R. 378 (May 2, 2025); Galvasid's Sales Verification Exs., C.R. 741, 745–48, P.R. 406 (May 22, 2025) ("Sales Exs."); Verification of the Sales Resp. of Galvasid in the AD Investigation of CORE Products from Mexico, C.R. 829, P.R. 421 (July 11, 2025).

On August 29, 2025, Commerce issued its final affirmative determination, applying partial facts available with an adverse inference and calculating a 24.05% weighted-average dumping margin for Galvasid.  Final Determination; Issues and Decision Mem. for the Final Affirmative Determination of Sales at LTFV in the Investigation of CORE Products from Mexico at 48–49, A-201-863, POI 7/1/2023-6/30/2024 (Dep't Commerce Aug. 25, 2025) ("IDM"); see also Final Determination Margin Calculation Mem. for Galvasid at 113, C.R. 866, P.R. 475 (Aug. 25, 2025). Commerce determined that Galvasid had failed to disclose in its questionnaire responses that it had included freight revenue and insurance revenue in its reported U.S. gross unit prices, or that it received these revenues in the U.S. market at all.  IDM at 48.

On September 2, 2025, Galvasid submitted a ministerial error allegation, alleging that Commerce's application of adverse facts available was based on a factual error that ignored record evidence.  Galvasid's Final Determination Ministerial Error Comments at 116, C.R. 869, P.R. 483

(Sep. 2, 2025). Commerce found that the alleged error was not ministerial because it found no evidence that Commerce had "overlooked" information in the record such that it had committed a ministerial error pursuant to 19 C.F.R. § 351.224(f).[2]  Commerce's Sep. 26, 2025, Ministerial Error Allegation Mem. at 5, 8, C.R. 871, P.R. 492 (Sep. 26, 2025).

Commerce published its final determination on December 19, 2025, with an estimated weighted-average dumping margin for Galvasid of 24.09%.  CORE from Brazil and Mexico: Amended Final Antidumping Duty Determination; CORE from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Antidumping Duty Orders, 90 Fed. Reg. 59,494, 59,496 (Dec. 19, 2025) ("Final AD Orders").

## JURISDICTION & STANDARD OF REVIEW

As discussed below, the court has jurisdiction pursuant to 19 U.S.C. § 1516a(g)(3)(A)(i) and 28 U.S.C. § 1581(c).  The court will uphold Commerce's determination in an AD proceeding unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.    The Court Has Jurisdiction Over the Present Action

Galvasid asserts that the court has jurisdiction over this action pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i), (a)(2)(B)(i), (g)(3)(A)(i), and (g)(3)(B).  Galvasid Mot. at 6–7; see Pl.'s Reply Br. at 3–5, ECF No. 41 (Apr. 24, 2026) ("Galvasid Reply").  According to Galvasid, this action is

---

[2] Commerce did find a ministerial error with respect to its application of the financial expense ratio, which, once corrected, resulted in an increase of Galvasid's margin from 24.05% to 24.09%. Commerce's Sep. 26, 2025, Ministerial Error Allegation Mem. at 3, C.R. 871, P.R. 492 (Sep. 26, 2025).

Court Nos. 25-00235 & 26-00825                                                                 Page 6

timely under 19 U.S.C. § 1516a because Galvasid filed its summons and complaint on October 28,

2025, within the 30-day period that began to run 31 days after the publication of Commerce's Final

Determination in the Federal Register on August 29, 2025.  Galvasid Mot. at 7; Galvasid Reply at

3–5.  Defendant-intervenors argue that this action is not timely because Galvasid could not have

sought judicial review until Commerce published its antidumping duty order on December 19,

2025,[3] and that, because Galvasid commenced this action before then, its action is premature under

28 U.S.C. § 2636(c).  See Def-Int. Resp. at 10–12.  Defendants do not respond to the issue.  See

Gov't Resp.

28 U.S.C. § 2636(c) bars an action commenced pursuant to 19 U.S.C. § 1516a unless it is

filed within the time frame specified in the statute.  Section 1516a ordinarily precludes review of

an affirmative determination in an antidumping duty investigation until an antidumping duty order

is published in the Federal Register.  19 U.S.C. § 1516a(a)(2)(A)(i)(II), (B)(i).  Special rules apply,

however, in cases involving merchandise from free trade area ("FTA") countries.[4]  See id.

§ 1516a(g).

In such cases, the court may review a determination when "neither the United States nor

the relevant FTA country [has] requested review by a binational panel pursuant to article 1904 of

the [United States-Canada Free-Trade Agreement ("USMCA")] or article 10.12 of the USMCA."

Id. § 1516a(g)(3)(A)(i).    This rule extends to final affirmative determinations.    Id.

---

[3] On January 23, 2026, Galvasid also filed a separate summons and complaint.  Summons, Case No. 26-00825, ECF No. 1 (Jan. 23, 2026); Compl., Case No. 26-00825, ECF No. 6 (Jan. 23, 2026).  Defendant-intervenors argue that this subsequent action is also untimely because it was filed more than 30 days after the AD orders were published on December 19, 2025.  Def-Int. Resp. at 11.  The court need not address this issue here because, as discussed below, the first complaint and summons filed under Ct. No. 25-00235 are timely and cover the claim at issue.  The court will dismiss the complaint in Ct. No. 26-00825.

[4] A relevant FTA country refers to either Mexico or Canada as long as the United States-Mexico-Canada Agreement ("USMCA") applies.  19 U.S.C. § 1516a(f)(9).

§ 1516a(g)(1)(B), (a)(2)(B)(i) (defining "determination" under subsection (g) to include final affirmative determinations).  The party seeking to commence review must have provided timely notice of its intent to do so to "(i) the United States Secretary [of Commerce] and the relevant FTA Secretary; (ii) all interested parties who were parties to the proceeding in connection with which the matter arises; and (iii) [Commerce] or the [International Trade] Commission, as appropriate." Id. § 1516a(g)(3)(B).

FTA-specific provisions further provide that the time limit for seeking review of a final affirmative determination begins to run on "the 31st day after the date on which notice of the determination is published in the Federal Register." Id. § 1516a(a)(5)(A).  The prescribed deadline makes no reference to publication of an antidumping duty order.  Id.; Bioparques de Occidente S.A. de C.V. v. United States, 31 F.4th 1336, 1347 (Fed. Cir. 2022).  In fact, the court has explained why 19 U.S.C. § 1516a(g) permits review of final antidumping duty determinations involving USMCA countries before the antidumping duty order is published. See Am. Cast Iron Pipe Co. v. United States, 405 F. Supp. 3d 1378, 1383 (CIT 2019) (noting that 19 U.S.C. § 1516a(a)(5)(A) requires that the 30-day period for filing an appeal of a final determination involving a USMCA country begin on the 31st day after the final determination is published in the Federal Register in order to permit time for a party to provide notice that it is selecting judicial review instead of the binational forum and to permit other parties time to opt for binational panel review);[5] see also Pipe

---

[5] The period for notice is 20 days.  19 U.S.C. § 1516a(g)(3)(B), (g)(8); 19 C.F.R. § 356.4(a); see also Am. Cast Iron Pipe Co., 405 F. Supp. 3d at 1383 ("Other parties to the administrative proceeding thereby receive notice of a party's intention to bring an action in the Court of International Trade before expiration of the time to file a request for binational panel review (which, as a general matter, will preclude subsequent judicial review in this Court, with certain exceptions, e.g., for constitutional claims). Under the statutory scheme, these other parties will have a minimum of ten days following receipt of the notice of intent in which to request binational panel review.").  The parties do not dispute the adequacy of Galvasid's notice. See Def.-Int. Resp.; Gov't Resp.

Court Nos. 25-00235 & 26-00825                                                    Page 8

& Piling Supplies v. United States, 798 F. Supp. 3d 1370, 1376 (CIT 2025), appeal docketed, No. 2026-1155 (Fed. Cir. Nov. 14, 2025) (explaining that judicial review may commence only after the 30-day period for requesting binational panel review has expired).

Accordingly, no antidumping duty order is required before a party may commence an action. Bioparques, 31 F.4th at 1347. A party commences an action by filing a summons and a complaint. 19 U.S.C. § 1516a(a)(2)(A). Parties have 30 days after 31 days have passed since the publication of the final determination in the Federal Register to file a summons and 30 days thereafter to file a complaint. Id. § 1516a(a)(2).

This case involves merchandise from Mexico, a FTA country. Id. § 1516a(f)(9)(B). The Final Determination was published in the Federal Register on August 29, 2025. Final Determination. Galvasid provideda Notice of Intent to Commence Judicial Review on September 18, 2025. Galvasid Mot. at 7; see Gov't Resp. Neither the United States nor Mexico requested review by a binational panel. Galvasid Mot. at 7; see Gov't Resp.; Def.-Int. Resp. Galvasid filed a summons and complaint on October 28, 2025. Summons, ECF No. 1 (Oct. 28, 2025); Compl.

The 30-day time limit for filing a summons began to run on September 29, 2025, 31 days after Commerce's publication of the final determination in the Federal Register. See Bioparques, 31 F.4th at 1347. Under the statute, Galvasid's summons and complaint were due on October 29 and November 28, 2025, respectively. See 19 U.S.C. § 1516a(a)(5)(A), (a)(2)(A). Because Galvasid filed both the summons and complaint on October 28, 2025—within the time limits contemplated by the statute—Galvasid's action was timely filed.

II.    **Commerce's Application of "Facts Otherwise Available" With an Adverse Inference to Galvasid Is Unreasonable**

The core of the dispute in this case is whether Galvasid answered fully Commerce's questionnaire or left out information that was sought by Commerce relating to revenue from

Court Nos. 25-00235 & 26-00825                                                        Page 9

service charges that are negotiated separately with customers.  Commerce's initial questionnaire

to Galvasid included the following instructions for reporting revenues:

> The gross unit price less price adjustments should equal the net amount of revenue
> received from the sale. <u>If the invoice to your customer includes separate charges
> for other services directly related to the sale</u>, such as a charge for shipping, create a
> separate field for reporting each additional charge.

Init. Questions at B-18, C-16 (emphasis added).

> The fields listed above have been designed to capture <u>all revenues and expenses</u>
> you have incurred in selling the subject merchandise in the United States market.
> If there are additional revenues or expenses that are not reported above, such as
> export taxes incurred in the country of manufacture, create a field for each in the
> computer file, describe the revenue or expense in your narrative response, and
> include all calculation worksheets as attachments to your narrative response.

Id. at B-33, C-37 (emphasis added).

Galvasid reported that all its U.S. sales were made on a Delivered Duty Paid[6] ("DDP") or

Cost, Insurance, and Freight[7] ("CIF") basis.  C Resp. at 14, 17, 27, 30–35.  Accordingly, it stated

that there was no additional freight or insurance revenue charged to the customers for its sales.  Id.

In its response to Section B of Commerce's initial questionnaire,[8] Galvasid explained that it

"charged certain home-market customers for freight and/or insurance, as separate items on the

---

[6] When a sale is made DDP, a seller must "(1) clear the goods for export, (2) bear the cost of carriage, (3) pay the buyer's import duties, and (4) make the goods available to the buyer on board the carrier at the destination." Delivered Duty Paid, BLACK'S LAW DICTIONARY (12th ed. 2024).

[7] When a sale is made CIF, a seller must "(1) clear the goods for export, (2) arrange for transportation by water, (3) procure insurance against the buyer's risk of damage during carriage, and (4) pay the costs of shipping to the port of destination." Cost, Insurance, and Freight, BLACK'S LAW DICTIONARY (12th ed. 2024).

[8] Commerce's question related to the Gross Unit Price:

> Report the unit price as it appears on the invoice for sales shipped and invoiced in
> whole or in part. To report portions of sales not shipped, provide the agreed unit
> sale price for the quantity that will be shipped to complete the order. This value
> should be the gross unit price. Discounts and rebates should be reported separately
> in fields numbered 19.n and 20.n, respectively.

Init. Questions at B-19.

invoice," B Resp. at 23, but not U.S. market customers. See C Resp. at 14. In its response to

Section C of Commerce's initial questionnaire, Galvasid stated

> As explained in Galvasid's Section A response, the U.S. sales of subject CORE products during the investigation period were made primarily through direct shipments by Galvasid to the destination in the United States designated by the unaffiliated U.S. customer. Sales to Puerto Rico were made on a CIF basis to an unaffiliated customer. Sales to other U.S. destinations were made on a DDP basis to the destination designated by the customer.

Id.; see also id. at 17, 30 (reiterating that sales to Puerto Rico were made on a CIF basis and those

to other U.S. customers were made on a DDP basis). Galvasid further reported the cost of

transporting to Puerto Rico and the cost of transporting to the rest of the U.S.; Galvasid did not

obtain marine insurance for its Puerto Rican sales and did not incur additional costs for insurance

for its other U.S. sales. Id. at 30–31; id. at 30 (citing Appendices C-1, C-12). Galvasid also

explained that "[t]he payment terms for each sale are stated on Galvasid's invoices to the customer

. . . [, and] are set through negotiations with the customer." C Resp. at 18.

At verification, Galvasid provided seven U.S. market sample sales, and none of the

commercial invoices show charges for insurance, freight, warranty, or transportation. See Sales

Exs. at 23. Either the purchase orders or the packing lists provided explicitly state that the sales

were on a DDP or CIF basis. See, e.g., Sales Exs. at 193–96 (SEQU [[     ]], DDP to [[

]]); id. at 264 (SEQU [[     ]], DDP to [[          ]]); id. at 420 (SEQU [[   ]], CIF to Puerto

Rico).[9]

In the IDM, Commerce noted that Galvasid failed to disclose that it had included freight

and insurance revenue within its reported U.S. gross unit prices, a fact Commerce only discovered

---

[9] The packing list for SEQU [[   ]] is labeled DAP [[     ]]. See Sales Exs. at 393. When a sale is made DAP (or DAF), a seller must "(1) clear the goods for export, (2) arrange and pay for transportation, and (3) deliver the goods to a specified place on the importing country's border." Delivered At Frontier, BLACK'S LAW DICTIONARY (12th ed. 2024).

during verification, making it impossible to assess the appropriateness of this reporting or to verify the relevant amounts beforehand.  IDM at 48.  According to Commerce, because Galvasid bore the burden of developing an adequate record and failed to do so, Commerce found necessary information missing, unverifiable, and untimely under section 1677e(a), and concluded under section 1677e(b) that Galvasid did not act to the best of its ability, warranting an adverse inference.  Id. at 48–49.  As partial adverse facts available, Commerce applied the petitioner's sample-based estimate to reduce Galvasid's reported U.S. gross unit prices, accounting for the undisclosed freight and insurance revenue.  Id. at 49.

Galvasid argues that because it explicitly informed Commerce that its U.S. sales were all made on either a DDP or CIF basis, the record was complete, and the record evidence, including documents provided at verification, confirmed that Galvasid had no additional revenue for freight or insurance in its U.S. sales.  Galvasid. Mot. at 19, 23.  According to Galvasid, Commerce improperly made an adverse inference when it found that Galvasid had failed to provide its internal breakdown of its invoice prices.  Id. at 26–29; Galvasid Reply at 8–10.  Galvasid cites to past decisions by Commerce for the proposition that when a CIF or DDP sale is made, the respondent need not report freight and insurance "revenues" in separate fields in its sales database because the unit price on the invoice is the final price and is inclusive of freight and insurance.  Galvasid Mot. at 21–22 (citing Polyester Textured Yarn from Thailand: Final Affirmative Determination of Sales at Less Than Fair Value, 86 Fed. Reg. 58,883 (Dep't Commerce Oct. 25, 2021); Certain Preserved Mushrooms from the Netherlands: Final Affirmative Determination of Sales at Less Than Fair Value, 88 Fed. Reg. 18,115 (Dep't Commerce Mar. 27, 2023); Common Alloy Aluminum Sheet from India: Final Results of Antidumping Duty Administrative Review; 2020-2022, 88 Fed. Reg. 76,724 (Dep't Commerce Nov. 7, 2023)).  Galvasid also observes that where the service revenue

amount is <u>not</u> separately negotiated with the customer, no additional downward adjustments to unit price are required.[10] <u>Id.</u> at 24–25 (citing <u>Hyundai Heavy Indus. Co. v. United States</u>, 393 F. Supp. 3d 1293, 1307 (CIT 2019); <u>ABB Inc. v. United States</u>, 355 F. Supp. 3d 1206, 1220–21 (CIT 2018)).

The government responds that Commerce's use of "facts otherwise available" with an adverse inference was appropriate because Galvasid's reporting method overstated U.S. prices by including the freight and insurance revenue. Gov't Resp. at 15. First, the government argues that Galvasid failed to create fields for freight or insurance revenue as it had for its home market sales when it created its sales database for Commerce, and that at verification, Commerce found freight revenue as separate line items in the U.S. sales documentation. <u>Id.</u> at 15–18. According to the government, Commerce could not establish whether its capping practice was appropriate because values for freight and insurance revenue were included within the gross unit price of Galvasid's U.S. sales database. <u>Id.</u> at 19, 25. Second, the government argues that Galvasid failed to act to the best of its ability and put forth maximum effort within the meaning of section 1677e(b)(1)(B) because Commerce specifically asked Galvasid to report revenues that it receives in separate data fields in its sales database. <u>Id.</u> at 27 (citing <u>IDM</u> at 47; <u>Nippon Steel Corp. v. United States</u>, 337 F.3d 1373, 1382 (Fed. Cir. 2003)).

The defendant-intervenors argue that Galvasid failed to report that it received revenue from

---

[10] No party disputes that Commerce has a practice of excluding excess freight and insurance revenue from gross unit price where they are separately negotiated. Galvasid Mot. at 25; <u>see</u> Gov't Resp. at 21–22; <u>see also</u> <u>IDM</u> at 47 ("Commerce's practice is to exclude freight and insurance revenue from the calculation of gross unit price and instead cap these revenues by the expense amount when appropriate."). This is referred to as the "capping" methodology. "Capping" reflects the particular mathematical methodology Commerce uses. <u>See also</u> <u>NEXTEEL Co. v. United States</u>, 28 F.4th 1226, 1239 (Fed. Cir. 2022) (describing methodology); <u>Hyundai Heavy Indus. Co. v. United States</u>, 393 F. Supp. 3d 1293, 1307 (CIT 2019) (same).

its U.S. customers to offset its freight and insurance costs, so Commerce should use facts otherwise available to adjust Galvasid's gross unit prices by the sample-based estimate.[11]  Def.-Int. Resp. at 13–14.  They explain that (1) Commerce decides what information is to be provided, not Galvasid, id. at 17–18 (citing Ansaldo Componenti, S.p.A. v. United States, 628 F. Supp. 198, 205 (CIT 1986); ABB Inc., 355 F. Supp. 3d at 1222 n.24); (2) Commerce is correct in distinguishing between expense reporting and revenue reporting when they are not equivalent, id. at 18; and (3) Commerce could not independently discern Galvasid's internal assignment of DDP and CIF amounts to freight and insurance because it was not apparent on the face of Galvasid's sales reconciliation.[12]  Id. at 22.  Regarding the "capping" methodology, the defendant-intervenors argue that Commerce was not given the chance to decide whether freight and insurance revenues were separately negotiable and thus Galvasid should be subject to the methodology because Commerce did not learn about these revenues until verification.  Id. at 23–24.

Two legal frameworks are at play here: the application of facts otherwise available and

---

[11] According to defendant-intervenor, in this case, that amount was [[    ]].    Def.-Int. Resp. at 5.

[12] Defendant-intervenors further argue that Commerce's prior decisions that Galvasid relies on in its brief are distinguishable because, unlike here, the respondents affirmatively developed the record before verification by disclosing and documenting freight and insurance revenues, rather than relying solely on DDP or CIF sales terms.  Def.-Int. Resp. at 19–23.  In Polyester Textured Yarn from Thailand, for example, respondent submitted sample sales documentation before verification demonstrating that its invoice prices were inclusive of freight expenses.  Id. at 20 (citing Polyester Textured Yarn from Thailand: Final Affirmative Determination of Sales at Less Than Fair Value, 86 Fed. Reg. 58,883 (Dep't Commerce Oct. 25, 2021)).  And, in Common Alloy Aluminum Sheet from India, respondent disclosed its internal accounting records and explained why freight and insurance revenues were separately recorded.  Id. at 21 (citing Common Alloy Aluminum Sheet from India: Final Results of Antidumping Duty Administrative Review; 202-2022, 88 Fed. Reg. 76, 724 (Dep't Commerce Nov. 7, 2023)).  The court, however, need not discuss the intricacies of these Commerce decisions.  First, each administrative review is a "separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record."  Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1387 (Fed. Cir. 2014).  Second, as discussed below, the deciding factor is whether there is substantial evidence that freight or insurance charges were separately negotiated.  See infra pp. 15–17.

Commerce's specific methodology for revenue.  The court discusses each in turn.

Commerce may fill in gaps in the administrative record using "facts otherwise available," and, if appropriate, applying an "adverse inference."  See 19 U.S.C. § 1677e(a)–(b).  Commerce shall use "facts otherwise available" if it determines that (1) "necessary information is not available on the record" or (2) "an interested party or any other person . . . withholds information that has been requested by [Commerce]," "fails to provide such information by the deadlines . . . or in the form and manner requested," "significantly impedes a proceeding," or provides information that cannot be verified.  Id. § 1677e(a).  If Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," id. § 1677e(b)(1), Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."[13]  Id. § 1677e(b)(1)(A).

To achieve a "fair comparison" between normal value and export price, Commerce must adjust for the additional cost of shipping to the United States.  Id. § 1677a(c); NEXTEEL Co. v. United States, 28 F.4th 1226, 1239 (Fed. Cir. 2022); Torrington Co. v. United States, 68 F.3d 1347, 1353 (Fed. Cir. 1995).  The export price[14] must be

> reduced by . . . the amount, if any, included in such price, attributable to any

---

[13] An interested party has acted to the "best of its ability" when it "has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."  Nippon Steel Corp., 337 F.3d at 1382.  The standard "does not require perfection and recognizes that mistakes sometimes occur," but it also does not "condone inattentiveness, carelessness, or inadequate record keeping."  Id.  Respondents should

> (a) take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce; (b) have familiarity with all of the records it maintains in its possession, custody, or control; and (c) conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so.

Id.

[14] Here, the court will refer to export price, although the same adjustment applies to constructed export price.  19 U.S.C. § 1677a(c).

additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States.

19 U.S.C. § 1677a(c)(2)(A).

But Commerce has a further adjustment to unit price relating to such expenses. Commerce has adopted the practice of removing from the export price additional freight and insurance revenue above the amount of the actual freight or insurance costs incurred, where such items are separately negotiated. See Hyundai, 393 F. Supp. 3d at 1307. Where substantial evidence shows that the cost of the service was negotiated independently of the price of the subject merchandise, Commerce may deduct the excess revenue from the export price or constructed export price. See id. However, "[w]hen substantial evidence does not support a finding that the cost of the services was separately negotiable from the price of the subject merchandise, the agency is without legal authority to reduce export price or [constructed export price] except by the amount of the expense in question." ABB Inc., 355 F. Supp. 3d at 1220.

This makes sense. If there is a separate contract about the additional costs to ship to the United States, and it results in a profit, that profit should not increase the export or constructed export price. It is not a component of the price of the good.

Commerce's initial questionnaire asks for "separate charges for other services directly related to the sale." Init. Questions at B-18, C-16. Considering that both judicial and administrative precedents make it clear that only separately negotiated charges are of concern, there was no reason for Galvasid to add additional information to its answer. The "charge" was not separate. Thus, there was no failure to answer a question and no gap in the record. The record consistently demonstrates that Galvasid sold all its U.S. merchandise on either a DDP or CIF basis. See, e.g., C Resp. at 14. Under those terms, the customer paid a single negotiated price for the

delivered merchandise.  Galvasid repeatedly reported that its U.S. sales were made on a DDP or CIF basis, reported the corresponding service-related expenses, and explained that only certain home-market customers—not its U.S. customers—were separately charged for freight or insurance.  See B Resp. at 23; C Resp. at 14, 17–18, 30–34.  The commercial invoices reviewed at verification likewise contain no separate charges for freight or insurance and, in several instances, expressly identify the sales as DDP or CIF.  See, e.g., Sales Exs. at 196 (SEQU [[    ]],   DDP to [[               ]]),  id. at 420 (SEQU [[   ]],   CIF to Puerto Rico).

Commerce nevertheless concluded that Galvasid had failed to disclose freight and insurance revenue because Galvasid's internal accounting records allocated portions of the invoice price to freight and insurance.  The relevant inquiry under Commerce's methodology is not how a respondent internally allocates a lump-sum sales price after the sale, but whether the service charges were negotiated independently of the price of the subject merchandise.  See Hyundai, 393 F. Supp. 3d at 1307; ABB Inc., 355 F. Supp. 3d at 1220.  The existence of internal accounting allocations does not constitute substantial evidence that Galvasid independently negotiated or billed freight or insurance to its U.S. customers.  Nothing cited in the record indicates that Galvasid's customers negotiated or paid separate freight or insurance charges.  The invoices only show one charge, the price of the CORE to be delivered.

Absent substantial evidence that freight or insurance charges were separately negotiated, Commerce has no basis to apply its additional revenue capturing methodology.  Because the record established that Galvasid's U.S. sales were made at a single DDP or CIF price, there was no missing information concerning separately negotiated freight or insurance revenue for Commerce to obtain or estimate.  The internal accounting entries discovered at verification therefore did not expose a gap in the record; they merely reflected Galvasid's internal allocation of the revenue

generated by a single delivered-price sale.  Had Commerce wanted this information sooner, it needed to ask for internal accounting records showing revenue from freight.  See Saha Thai Steel Pipe Public Co. v. United States, 605 F. Supp. 3d 1348, 1363 (CIT 2022) ("Commerce must clearly and definitively ask for what it wants."); Hitachi Energy USA Inc. v. United States, 34 F.4th 1375, 1384 (Fed Cir. 2022) (citing SKF USA Inc. v. United States, 391 F. Supp. 2d 1327, 1336 (CIT 2005)) (noting that clarity regarding information requested is important).  Although why it would seek this information is not clear.

Commerce thus necessarily lacked a basis to conclude that Galvasid failed to cooperate to the best of its ability under section 1677e(b)(1).  Commerce's application of partial adverse facts available consequently was unsupported by substantial evidence and not in accordance with law.

On remand, on this record, Commerce shall reconsider Galvasid's dumping margin without applying facts otherwise available or an adverse inference predicated on Galvasid's purported failure to report separate freight or insurance revenue.

## CONCLUSION

For the foregoing reasons, the court remands to Commerce for the reconsideration of the AD rate consistent with this opinion.  The remand shall be issued within 60 days thereof. Comments may be filed 20 days thereafter and any response 11 days thereafter.

  /s/ Jane A. Restani
Jane A. Restani, Judge

Dated: July 24, 2026
New York, New York